CITY OF CROSSETT *v.* PACIFIC BUILDINGS, INC.

88-286 769 S.W.2d 730

Supreme Court of Arkansas
Opinion delivered May 1, 1989

*Thomas S. Streetman*, Crossett City Attorney, for appellant.

*John R. Byrd*, for appellee.

TOM GLAZE, Justice. This is an appeal from the chancellor's ruling ordering the City of Crossett to accept, maintain and operate the sewer system installed in the Woodlawn Subdivision. The city appeals, alleging seven points of error. We find no error

and therefore affirm.

The Woodlawn Subdivision was the product of a joint venture between Southeast Properties and Real Estate and Pacific Buildings, Incorporated. These two companies used the name Woodlawn Development Company (Woodlawn) for their joint venture.[1] Woodlawn employed the engineering firm of Marion Crist and Associates, which assisted in designing a plan for a 150 house subdivision. The Woodlawn developers met with the Crossett Sewer Commission, and on August 21, 1972, the Commission and its chairman introduced a proposal for the Woodlawn Subdivision to tie into the city's sewer system. Woodlawn was to install the system, and the city was to maintain it. The Crossett City Council approved the proposal. After the city's approval, Woodlawn obtained financing and hired Byron Jones to install the system. As the developers constructed and completed houses in the subdivision, they connected and tied the houses into the city's water and sewer systems.

On March 18, 1974, the city council changed its position and voted that Woodlawn must both install and maintain the sewer system. Robert Kennedy, a partner in Southeast Properties, testified that he was unaware of this change or the council's meeting. It is conceded, however, that Woodlawn had been operating and maintaining the system since it was installed. Nonetheless, according to Kennedy, he first became aware of the city's refusal to maintain the sewer system only when he received a complaint from the State Health Department in January of 1979. After learning of the city's decision to require Woodlawn to maintain the system, Woodlawn met with the Crossett City Council on February 26, 1979. As a result of that meeting, the council passed a motion that it would accept the obligation to maintain and operate the sewer system if the city was furnished with written certification from Marion Crist and Associates that (1) the system was constructed according to the construction standards of the city or (2) the system now meets the construction

---

[1] Pacific Buildings, Inc. has since purchased Southeast Properties' interest in the subdivision and is now the only company involved in this litigation. For opinion writing purposes, Pacific Buildings, Inc. and Woodlawn will be considered as one and the same.

standards of the city for a sanitary sewer system.

After two inspections by Robert Yeatman, an employee of Marion Crist, and the completion of recommended repair work, Yeatman, in a letter to the city dated October 20, 1986, certified that Woodlawn's sewer system was now in compliance with the city's standards for sanitary sewerage facilities. However, on May 18, 1987, the Crossett City Council still voted not to accept the system. Woodlawn (Pacific Buildings, Inc.) filed suit against the city asking for specific performance and mandatory relief requiring the city to accept, maintain and operate the sewer system. The city responded by denying Woodlawn's claims and by raising the affirmative defenses of the statute of limitations, laches, waiver and estoppel. The city also claimed the chancery court had no jurisdiction to award the relief requested by Woodlawn. The trial court rejected all of the city's claims and defenses and ordered the city to accept, maintain and operate Woodlawn's system effective October 20, 1986, the date Marion Crist certified the system.

We first dispose of the city's jurisdiction argument when it claims the relief requested by Woodlawn is actually one of mandamus, which is not cognizable in chancery court. Although the city attempts to turn Woodlawn's action into one of mandamus, we point out that from the very inception of this litigation, Woodlawn has sought to compel the city to specifically perform its agreement or commitment to accept and maintain Woodlawn's water and sewer system in accordance with the parties' original agreement in 1972, and the more recent one, which resulted from their meeting on February 26, 1979. Specific performance is an equitable remedy which compels the performance of an agreement or contract on the precise terms agreed upon. *McCoy Farms, Inc.* v. *J & M McKee*, 263 Ark. 20, 563 S.W.2d 409 (1978). The chancery court in this cause clearly had the power to award the relief requested by Woodlawn.

We also find no merit in the city's arguments that the trial court erred in holding the city's defenses of statute of limitations, laches, waiver and estoppel did not bar Woodlawn's action. The city argues eight years elapsed between the time it conditionally agreed to maintain Woodlawn's system in February 1979, and when Woodlawn filed suit on August 12, 1987. The

record, however, reflects the parties' agreement never specified a time within which the conditions in the parties' 1979 agreement were to be completed. While the law provides for the implication of a reasonable time for the condition to be performed, the evidence reveals that both parties worked together and with others in order to resolve the problems surrounding Woodlawn's systems.[2] The city council apparently remained dissatisfied but did not refuse the system until May 18, 1987—after Woodlawn furnished the city the certification it requested. Woodlawn filed suit three months later. We believe the evidence clearly supports the chancellor's decision that Woodlawn's action was timely and did not prejudice the city's position in this cause.

■ Although the city also argues waiver and estoppel, we believe much of the evidence already noted above runs contrary to those defenses, as well. The city argues Woodlawn waived its claim that the city should maintain and operate the system because Woodlawn had maintained it over long periods of times. Further, the city says Woodlawn should be estopped to assert its claim because Woodlawn failed to construct the system as designed or to city standards, and it failed to construct the number of houses originally specified. It also asserts Woodlawn knew the sewer system did not work from the time it was built until sometime in 1984. Again, Woodlawn presented proof that it, the city and others were working towards the city assuming its obligation to maintain the subdivision's sewer system—as the city first promised in 1972. While the record reflects this matter was often an on-again, off-again project, Woodlawn never abandoned its actions to get the city to maintain the system, and as is evidenced by the city's actions in February 1979, the city continued to work with Woodlawn towards this end. The construction of the houses was to be performed in phases, and obviously their construction would in part be dependent upon the resolution of the differences between the city and Woodlawn over the sewer system.

---

[2] There was evidence to show that during this time Southeast Properties was having financial trouble which later led to Pacific Buildings purchasing its interest. During some of this time, the repair work on the sewer system was undertaken by a part-time service man.

■ The appellant next contends that the chancellor erred in finding that the Woodlawn sewer system met the city's construction standards for sanitary sewer systems. We cannot agree. This court will reverse a chancellor's finding only if it is clearly erroneous. ARCP Rule 52.

At the trial, Byron Jones, the contractor of the Woodlawn sewer system, testified that one four inch line ran from the main sewer line to a "Y" connector, which allowed lines from two houses to be attached. After hearing this testimony, Robert Yeatman testified on cross-examination that at the time he wrote the letter certifying that the sewer system met the city's standards, he was unaware that the system had only one service connection for every two lots. Yeatman further stated that the system's one four inch line to two houses did not meet the city standards and was not in accordance to the plans prepared by Marion Crist and Associates. The city also produced testimony by Dean Ray, the city building official, that Woodlawn's sewer system did not meet the city's standards.

■ In response to the foregoing testimony, Woodlawn had Ray explain that he could not show where the city standards required one line per house. In fact, Ray testified that the city had adopted the State Plumbing Code, which does *not* require one line per house. Ray conceded that he could not point to anything showing that the city had ever amended the code so as to require one service line to one house. Ray also testified that "there were some areas in Crossett that had two sewers tied into one line." In reviewing all of Ray's testimony, one could fairly state that parts of it may be cited to support either the city's or Woodlawn's position as to whether the Woodlawn system now meets the construction standards of the city. Because the record is unclear on what construction standards the city required, we simply are unable to say that the chancellor's finding was clearly erroneous on this issue.

We next consider the city's argument regarding whether the chancellor erred in allowing expert witnesses, Robert Yeatman and Jimmy Knight, to remain in the courtroom. The city had invoked "the rule" to have all witnesses not currently testifying removed from the courtroom. The chancellor granted the city's request, but allowed Woodlawn to have two expert witnesses

526

remain in the courtroom. We find no error in the trial judge's actions.

 Upon request of a party, the court shall order witnesses to be excluded so that they cannot hear the testimony of the other witnesses. A.R.E. Rule 615. The standard of discretion given to the trial judge by this part of the rule is that of no discretion. *Blaylock v. Strecker*, 291 Ark. 340, 724 S.W.2d 470 (1987). However, the rest of Rule 615 exempts certain persons from the operation of this rule, and the applicable provision here exempts a person whose presence is shown by a party to be essential to the presentation of his or her cause. When dealing with the exemptions from "the rule" provided in the Rule 615, this court has said that the trial judge has average discretion. *Id.*

When reviewing the testimony of Yeatman and Knight, on hindsight, we agree that their testimony was based more on their independent knowledge of the sewer system than on any knowledge they may have obtained by hearing other testimony in the courtroom. At the end of Yeatman's and Knight's testimony, the city objected that it had not been shown that their opinion testimony was based on other witnesses' testimony. Although the chancellor appeared to agree with the city, he overruled the objections because he found that the city had not been prejudiced. We agree.

 Violation of the witness-exclusion rule goes primarily to witness credibility. *See Martin v. State*, 22 Ark. App. 126, 736 S.W.2d 287 (1987). Here, the city was free to challenge the credibility of the witnesses' testimony on the basis that they had heard testimony from prior witnesses. The city has failed to show that it was prejudiced by Yeatman and Knight remaining in the courtroom. In fact, the city, in much of its argument on appeal, relies heavily on Yeatman's opinion testimony, elicited during the city's cross-examination, which was based upon Byron Jones's testimony at trial.

 Finally, the city argues that the chancellor erred in making its order retroactive to October 20, 1986, the date Yeatman certified by letter that Woodlawn's sewer system met the city's standards. The city's argument here is similar to its jurisdictional argument in that it claims Woodlawn's action is for preventive or injunctive relief, which is not relief which addresses

wrongs already committed. Here, the chancellor granted specific performance and stated further that it would enter orders of mandatory injunction as are necessary to insure that the city complies with the orders of the court. In granting such relief, the court merely took into account that the city had voted to accept the Woodlawn sewer system when it received the required letter of certification from Marion Crist and Associates. Accordingly, the condition to which the parties agreed was met on October 20, 1986, and the chancellor was correct to grant relief under the remedy of specific performance beginning with that date.

For the reasons stated above, we affirm.

HOLT, C.J., dissents.

JACK HOLT, JR., Chief Justice, dissenting. This case should be reversed and the suit dismissed. The order of the chancery court directs specific performance of an agreement by the City of Crossett to accept and maintain a sewer system located in the Woodlawn subdivision, which is owned by appellee Pacific Buildings, Inc. The City's obligation to accept and maintain the sewer system was conditioned upon a finding that the system met the City's standards. The evidence shows that the Woodlawn sewer system does not meet the City's standards at present, nor has it ever. The chancellor's findings to the contrary are clearly against a preponderance of the evidence. The City is also correct when it argues that the trial court erred in allowing witnesses for Pacific to remain in the courtroom in violation of A.R.E. Rule 615.

Pacific's predecessor in interest, Richard Kennedy, began the Woodlawn subdivision project in 1972. In order to obtain financing, Kennedy had to obtain the City's commitment to maintain the sewer system once it was built. Plans for construction of the system were drafted to meet the City's standards and were submitted by the engineering firm of Marion Crist and Associates in 1972. Those plans were approved by the City Engineer, the Planning Commission, and the Sewer Commission. Thereafter, the City voted in favor of a proposal to maintain the system.

Approximately 30 lots were developed in 1973, and the sewer system was constructed by Byron Jones. During construc-

tion, the City Engineer inspected and approved the system, which was connected to the City's sewer system although the subdivision had its own pumping station.

Kennedy testified that after construction, during the seven year period from 1972 until 1979, either he or his son maintained the sewer system. The record is clear that the City did nothing as concerns its commitment, and Kennedy did not require it. In fact, as the majority points out, when the City decided not to maintain the system in 1974, Kennedy had no knowledge of that action. This lack of knowledge was typical of the situation, and I find no support for the majority's conclusion that there existed a working relationship between the parties as concerns who was to eventually maintain the system.

By 1979, the system had deteriorated to such an extent that the pumps were failing, the system was overflowing, and at times it had simply shutdown. The record shows that from 1978 until 1979, neither Kennedy nor anyone else bothered to check the system. Finally, in 1979 Kennedy received a notice from the Department of Health concerning the Woodlawn sewer system.

When Kennedy again went to the City Council to discuss the City's commitment to maintain the system, he was informed that the City no longer considered itself bound by its original agreement. However, after another meeting, the City decided to accept and maintain the system provided: (1) Kennedy obtain certification that the system as originally installed was built according to City's standards; or (2) Marion Crist and Associates certify that the system in its present condition met City standards.

Yeatman, the engineer with Marion Crist who drafted the plans for the Woodlawn sewer system, informed Kennedy that he could not certify the system as originally built because he had not supervised its construction. However, he was willing to inspect the system and certify that in its present condition it was up to City's standards. Upon inspection, Yeatman discovered that the system was plagued with malfunctions and construction errors such as sewer lines which ran beneath manholes but which had never been connected to the manholes. He contacted Kennedy and the City, outlined all of the deficiencies, and indicated he could not certify the system as being in compliance with City standards.

For the next four years, between 1979 and 1983, Kennedy tried to upgrade the system on his own. He was not able to do much, and in 1983 he contacted a firm to overhaul the system. In 1984, Pacific bought out Kennedy's interest as it became clear that the entire subdivision was failing. Pacific spent approximately $10,000.00 to install a new pumping system and to correct any problems as to the manholes—some of which could not be located. In fact, a few of the manholes had never been built, some were improperly installed, and several had not been connected or if connected had not been finished; others were overgrown with weeds and covered with garbage to the point that they were not functional. In 1986, after two inspections, Yeatman wrote a letter certifying the Woodlawn sewer system as meeting City standards. In 1987, Pacific contacted the City to request that the municipality accept and maintain the sewer system. The City declined and Pacific brought suit.

Our standard of review in cases from chancery court is that we review the entire case *de novo* but will not reverse unless the findings of the lower court are clearly erroneous or clearly against a preponderance of the evidence. *Witt* v. *Rosen*, 298 Ark. 187, 765 S.W.2d 956 (1989). The only real basis for the chancellor's decree of specific performance is the 1986 letter by Yeatman in which he stated after inspection that the system met City standards. A preponderance of the evidence clearly demonstrates that the condition had never been satisfied.

Yeatman testified that he had been involved in a majority of all sewer projects constructed in the City of Crossett since 1962. His firm drafted the plans and specifications for the Woodlawn sewer system, and he was aware of the necessity that the City assume maintenance of the system so that Kennedy could obtain financing. In fact, it was his understanding that the Woodlawn system was to be owned and operated by the City. Accordingly, *the plans were drafted so that the system would meet the City standards*.

Byron Jones, who represented the firm that constructed the system, testified at trial that when he installed the service lines from the sewer mains to the lots, he would install only one line for every two lots. Apparently, he installed a service line at or near the juncture of the property lines for two lots, skipped a lot, and so

on. The service lines ended in a "Y" so that two adjoining lots could tie in upon completion of the homes.

An examination of the exhibits introduced at trial demonstrates that the plans and specifications for the sewer system called for *one service line to be constructed per lot or home.* Clearly, this was not done. Yeatman first learned of this fact at trial. He testified that his inspection of the system had not disclosed the failure by Jones to comply with the original plans since it would have been necessary to dig up the service lines or place a camera in the mains. Yeatman further testified that the failure to use or construct one service line for each lot would result in problems with the system in the future. Finally, Yeatman testified that he had not known of the defect when he wrote his certification letter in 1986; he then states, "now that I am aware of it, *the system does not comply with the standards of the City of Crossett.*" (Emphasis mine.)

What the majority seems to ignore is that this undisputed testimony came from the individual who wrote the letter upon which the chancellor based his decree of specific performance. Yeatman drafted the Woodlawn sewer system plans in accordance with City standards to require one service line per lot; he later certified the system without knowing that it had not been constructed accordingly. Upon discovering the truth, he testified that the system did not meet City standards.

The majority focuses its attention on the testimony of Dean Ray, the City's building official. Ray testified at trial that whereas the City had adopted the State Plumbing Code, which he thought required one service line per lot or house, he could not find that requirement in the Code. Nevertheless, Ray went on to testify that "[t]he City is allowed to make amendments to the Code. *I have been operating under the policy that requires one per service line.*" (Emphasis mine.)

I fail to understand the magical significance which the majority attaches to adoption of the State Plumbing Code when the evidence clearly demonstrates that the City of Crossett, its engineer, the Planning Commission, and the Sewer Commission all approved the plans submitted by Crist and Associates, which required one service line per lot. The City had the forsight to require one service line per lot in the construction of sewer

systems and, obviously, the plans submitted by Yeatman evidenced the real standards of the City of Crossett, not the State Plumbing Code.

Dean Ray testified that during the week before trial he conducted a complete examination of the Woodlawn sewer system. He stated that the connection between several of the manholes and the actual sewer main was nonexistent. Installation of these manholes had sometimes apparently involved no more than breaking an opening into the top of the sewer main below the manhole cover. Debris collected in the main and around the jagged edges near the bottom of the manhole. Both Ray and Yeatman testified that this condition *did not comply with either the plans or the City's standards.* Ray further established that many of the deficiencies which originally caused Yeatman not to certify the system remained at the time of trial. To some extent, the mayor corroborated the existing defects in the system. The only testimony to refute the evidence concerning the condition of the system was presented by the individual who did the repairs, and he simply stated that to the best of his knowledge he had done everything required by Yeatman to bring the system up to par.

If an enforceable agreement between the City and Pacific existed, it was that the City would maintain the Woodlawn sewer system once it met established City standards. The trial court found, based upon Yeatman's 1986 letter, that the condition had been satisfied. That conclusion is clearly erroneous, even in light of the trial court's ability to judge credibility, since by Yeatman's undisputed testimony alone the Woodlawn sewer system fails to meet City standards—both with respect to the service lines and as to the problems with the manholes. On this point the case should be reversed and the suit dismissed.

I disagree with the majority in at least one other respect. A.R.E. Rule 615 provides that upon the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses. *See e.g., Martin* v. *State*, 22 Ark. App. 126, 736 S.W.2d 287 (1987). The standard of discretion given to the trial court by this part of the rule is that of no discretion. *Blaylock* v. *Strecker*, 291 Ark. 340, 724 S.W.2d 470 (1987). Use of the word "shall" makes exclusion of the witness mandatory. If a party requests the rule, it must be granted.

532

*Martin, supra; Blaylock, supra.*

The remainder of the rule exempts certain persons from its operation. In part, it provides that the rule does not authorize exclusion of "a person whose presence is shown by a party to be essential to the presentation of his cause." When an exception to the rule is sought under this language, it is usually based upon A.R.E. Rule 703. *Martin, supra.* Rule 703 deals with expert witnesses who will be present in court to hear the evidence. The exception is not automatic, however, and depends upon the extent to which the expert actually bases his opinion upon testimony presented in court. The witness should be allowed to remain only if his testimony is to be based upon matters testified to by other witnesses. When a party seeks to exempt an expert witness, the decision is within the discretion of the trial court, but this court will reverse if we find an abuse of that discretion.

In the case at bar, after "the rule" had been requested at the start of trial, the City objected to the presence of Yeatman and Knight in the courtroom at every possible point in the trial. Pacific maintained that Yeatman and Knight came within the exception to the rule as they were expert witnesses whose presence at trial was necessary. The trial court allowed the witnesses to remain in the courtroom, and the City objected repeatedly as it became increasingly clear during trial that the testimony of the witnesses was based only upon what was within the personal knowledge of each and not upon the evidence introduced at trial. The chancellor found, at least as to Knight, that it had not been necessary for the witness to remain in the courtroom. Nonetheless, the City's objections were overruled.

The City argues that prejudice can be shown in that it intended to use the testimony of Byron Jones concerning his placement of the service lines on cross-examination of Yeatman and that the City lost the element of surprise when Yeatman was allowed to remain in the courtroom. I would conclude that because the rule is mandatory, the court should have excluded the witnesses unless it could be shown that they came within the exception. As it was clear that the witnesses did not need to remain in the courtroom, I feel the court abused its discretion.

One final point needs to be made. All actions based upon any contract or obligation not in writing must be commenced within

three years after the cause of action accrues. The chancellor ruled that the statute of limitations had not run as the parties did not specify a time period during which Kennedy or Pacific had to bring the sewer system up to City standards. Where no time period has been specified, a reasonable time period will be presumed. Here, Pacific did not attempt to have the City assume control of the sewer system until either 1986 or 1987, which is seven to eight years after the 1979 vote by the City Council to accept and maintain the system provided it met City standards. I find no support for the majority's position that the parties had been working together during this time to solve the question of who was to maintain the Woodlawn sewer system.