373 So.2d 890 (1979)
In re FLORIDA BOARD of BAR EXAMINERS.
In re H.H.S.
No. 52909.
Supreme Court of Florida.
July 12, 1979.
Robert M. Ervin, Thomas M. Ervin, Jr. and Dean Bunch of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for petitioner.
C. Graham Carothers, Tallahassee, for respondent.
PER CURIAM.
We have for consideration the petition of H.H.S. for admission to The Florida Bar.
H.H.S., a member in good standing of the bar of another state and presently residing in Florida, was admitted to and passed the February, 1976, Florida Bar Examination. After an informal hearing the Florida Board of Bar Examiners served specifications upon H.H.S. which were based primarily upon two incidents. H.H.S. entered a plea of nolo contendere in the United States District Court to a charge that he failed to file federal income tax returns for the years 1965, 1966, and 1967. He was adjudged guilty and on July 29, 1971, was imprisoned for a period of thirty days. As a result he was suspended for one year from the practice of law in the state in which he was admitted. H.H.S. was reinstated and is a member of the bar of that state at the present time.
The other incident related to a complicated real estate transaction in 1975. At the request of a realtor, H.H.S. acted as trustee and agent for the realtor, or a syndicate which the realtor sought to form. In the transaction H.H.S. was under a duty to disclose to the sellers that the identity of the person for whom he was acting as trustee was the realtor, at a time when the realtor or the company with which he was associated had a real estate nonexclusive listing on the subject property. H.H.S. did not make this disclosure.
After a final hearing on the board specifications the board recommended that H.H. *891 S.'s petition for admission to The Florida Bar be denied on the ground that H.H.S. failed to meet the standards of conduct and fitness required under the provisions of article IV, section 19, of the Rules Relating to Admission to The Florida Bar.
Article IV, section 19, of the rules does not set forth definite standards but merely provides that an applicant must be of "good moral character, [and] ... a fit person to take the oath and perform the obligations and responsibilities of an attorney." The inherent defects of a standard of "good moral character" standing alone, and the saving grace of a history of judicial construction have each been recognized by the United States Supreme Court. In Konigsberg v. State Bar of California, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957), the Court described the term "good moral character" as "unusually ambiguous" and held in pertinent part:
It can be defined in an almost unlimited number of ways for any definition will necessarily reflect the attitudes, experiences, and prejudices of the definer. Such a vague qualification, which is easily adapted to fit personal views and predilections, can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law.
The decisions of California courts . . appear to define "good moral character" in terms of an absence of proven conduct or acts which have been historically considered as manifestations of "moral turpitude."
353 U.S. at 263, 77 S.Ct. at 728 (footnote omitted).
But during the same term of court, the United States Supreme Court also articulated the following sentiments about the standard of "good moral character":
No doubt satisfaction of the requirement of moral character involves an exercise of delicate judgment on the part of those who reach a conclusion, having heard and seen the applicant for admission, a judgment of which it may be said as it was of "many honest and sensible judgments" in a different context that it expresses "an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions;  impressions which may lie beneath consciousness without losing their worth."
.....
Nor is the division of power between this Court and that of the States in such matters altered by the fact that the judgment here challenged involves the application of a conception like that of "moral character," which has shadowy rather than precise bounds. It cannot be that that conception  moral character  has now been found to be so indefinite, because necessarily implicating what are called subjective factors, that the States may no longer exact it from those who are to carry on "the public profession of the law." (See Elihu Root, in 2 A.B.A.J. 736.) To a wide and deep extent, the law depends upon the disciplined standards of the profession and belief in the integrity of the courts. We cannot fail to accord such confidence to the state process, and we must attribute to its courts the exercise of a fair and not a biased judgment in passing upon the applications of those seeking entry into the profession.
Schware v. Board of Bar Examiners, 353 U.S. 232, 248-49, 77 S.Ct. 752, 761, 1 L.Ed.2d 796 (1956) (Frankfurter, J., concurring).
Assuming, then that "moral turpitude" is the converse of "good moral character" and that this standard as refined by Schware comports with the concept of due process of law, two other concepts applicable to Bar admission proceedings must nonetheless be explored. The first has to do with burden of proof. In the Bar admission process the burden is upon the applicant to demonstrate his or her good moral character. Art. IV, § 19, Rules Relating to Admission to The Florida Bar (1977). Although the burden of coming forward with evidence may shift, the burden of proof never does. Coleman v. Watts, 81 So.2d 650 (Fla. 1955). Conversely, in disbarment cases there is no burden on the subject attorney to demonstrate his continuing fitness to practice. In fact the burden *892 is on The Florida Bar to demonstrate a lack of fitness by clear and convincing evidence. Florida Bar v. Quick, 279 So.2d 4, 7 (Fla. 1973).
Secondly, the same standard of fitness and character, or of conduct establishing the lack thereof, does not apply in proceedings wherein one seeks admission to the Bar as applies in disciplinary proceedings. Based upon his assertion that the standard is the same, petitioner develops the following syllogism: (1) denial of admission is equivalent to permanent disbarment, citing Lopez v. Florida Board of Bar Examiners, 231 So.2d 819 (Fla. 1970); (2) this Court has consistently refused to disbar permanently an attorney for failure to file income tax returns, citing Florida Bar v. Turner, 344 So.2d 1280 (Fla. 1977); Florida Bar v. Solomon, 338 So.2d 818 (Fla. 1976); In re Turk, 333 So.2d 16 (Fla. 1976); Florida Bar v. Miller, 322 So.2d 502 (Fla. 1975); Florida Bar v. Silver, 313 So.2d 688 (Fla. 1975); In re Snyder, 313 So.2d 33 (Fla. 1975); Florida Bar v. Turk, 202 So.2d 848 (Fla. 1967); Florida Bar v. Childs, 195 So.2d 862 (Fla. 1967); and, therefore, (3) one may not be denied admission for failure to file income tax returns. There are two flaws in this syllogism. First, denial of admission to the Bar is not the equivalent of permanent disbarment. An applicant may reapply after the expiration of two calendar years. Art. IV, § 20(c), Rules Relating to Admission to The Florida Bar. Second, in Florida Board of Bar Examiners re Eimers, 358 So.2d 7, 9 n. 1 (Fla. 1978), we recognized the differing standards to be met for admission to the Bar as compared to disciplinary or disbarment proceedings.
Furthermore, this Court has recently rejected the restricted view that lack of "good moral character" is limited to acts which reflect moral turpitude. In Florida Board of Bar Examiners re G.W.L., 364 So.2d 454, 458 (Fla. 1978), the rule is announced:
In our view, a finding of a lack of "good moral character" should not be restricted to those acts that reflect moral turpitude. A more appropriate definition of the phrase requires an inclusion of acts and conduct which would cause a reasonable man to have substantial doubts about an individual's honesty, fairness, and respect for the rights of others and for the laws of the state and nation. See Konigsberg, supra.

Applying the foregoing burden of proof and standards as to "good moral character," although some of the evidence was in conflict we cannot conclude that there was a lack of competent substantial evidence in the record to support the board's recommendation. Accordingly, the petition for admission to The Florida Bar by H.H.S. is denied.
It is so ordered.
ENGLAND, C.J., and OVERTON, SUNDBERG, HATCHETT and ALDERMAN, JJ., concur.
ADKINS, J., dissents with an opinion, with which BOYD, J., concurs.
ADKINS, Justice, dissenting.
The denial of admission to the Bar is the equivalent of permanent disbarment. This Court, in Lopez v. Florida Board of Bar Examiners, 231 So.2d 819, 821 (Fla. 1969) said:
While it is the Board's initial responsibility to make recommendations concerning admissions to the Bar, the Ultimate [sic] responsibility is that of this court... .
The applicant has given reasonable explanation of the other matters cited by the Board, and after reviewing the entire record, it is our opinion that applicant's long, diligent and determined efforts to obtain permission to practice his profession in this country should be recognized as some indication of his stability. To deny him the right to take the oath at this time would be the equivalent of a permanent disbarment which is not justified by the evidence. It is true that much of the evidence creates some suspicion about his ethical responsibility, but it must be remembered that as he enters the practice of law he will be bound by, and required to adhere strictly to, the *893 canons of ethics relating to the legal profession, and should he falter, The Florida Bar, under the rules of this court, possesses adequate machinery to bring him to accountability... . [Emphasis added.]
The same standards of fitness and character, or of conduct establishing the lack thereof, should apply in proceedings seeking admission to the Bar as in disbarment proceedings. In the bar-admission process the burden is on the applicant to demonstrate his or her moral character. Coleman v. Watts, 81 So.2d 650, 655 (Fla. 1955).
In disbarment cases there is no burden on the subject attorney to demonstrate his continuing fitness to practice. In fact the burden is on The Florida Bar to demonstrate his lack of fitness by clear and convincing evidence. The Florida Bar v. Quick, 279 So.2d 4, 7 (Fla. 1973).
H.H.S.' conviction in federal court was for a misdemeanor and his suspension from the practice of law in Maryland commenced April 1, 1972, and ended one year later. This conviction did not cause a loss of civil rights nor did it involve immoral conduct or moral turpitude. There was no suspicion of intended concealment of income from the government or intent to defraud. H.H.S. did not file false or fraudulent personal return; he simply filed no personal return at all. However, H.H.S., as a member of a partnership, was personally responsible for filing and did file the partnership informational return which disclosed all of his income for each year. During the period from 1965 through 1967 H.H.S. was under emotional strain due to domestic difficulties. He had never been convicted of any criminal charges of any kind other than minor traffic violations. Due to varied factual situations, the Court has reached different conclusions relating to the effect of a conviction for failure to file income tax returns.
In In re Schonfeld, 336 So.2d 77 (Fla. 1976), where an attorney had been convicted of failure to file, sentenced to sixty days imprisonment, and fined $1,000, this Court approved and published public reprimand as appropriate discipline.
In In re Snyder, 313 So.2d 33 (Fla. 1975), this Court approved and imposed public reprimand as appropriate discipline for conviction of failure to file income tax returns after plea of guilty to one count of an information charging three county of failure to file.
To the same effect is The Florida Bar v. Silver, 313 So.2d 688 (Fla. 1975), and, more recently, The Florida Bar v. Turner, 344 So.2d 1280 (Fla. 1977), each approving and imposing public reprimand as appropriate discipline upon conviction of failure to file tax returns.
Further, in The Florida Bar v. Miller, 322 So.2d 502 (Fla. 1975), where the accused who was also a real estate broker was convicted of filing a false income tax return, a felony, this Court imposed a ninety-day suspension with automatic reinstatement at the end of the period.
In The Florida Bar v. Solomon, 338 So.2d 818 (Fla. 1976), the accused had been convicted of misdemeanor failure to file for three additional years; had been the subject of two prior and separate private reprimands; and has previously been suspended from practice before the U.S. District Court for the Southern District of Florida for "wilful interference with the administration of justice." Therein this Court rejected the recommendation of a one-year suspension and imposed, as appropriate discipline, a six-month suspension, with permission to apply for reinstatement after the expiration of ninety days.
Even in The Florida Bar v. Turk, 202 So.2d 848 (Fla. 1967), where the attorney's knowing and wilful failure to file for five consecutive years was combined with the knowing and wilful conversion of $103,000 of funds of an estate entrusted to him, this Court rejected the recommendation of permanent disbarment and found appropriate a three-year disbarment with permission to apply thereafter, upon conditions, for readmission. By this Court's decision in In re Turk, 333 So.2d 16 (Fla. 1976), the attorney was reinstated.
*894 In The Florida Bar v. Childs, 195 So.2d 862 (Fla. 1967), the referee recommended a private reprimand, the Board of Governors entered judgment that Childs be suspended for one year, and, on review, this Court reduced the judgment to a six-month's suspension.
To deny H.H.S. the right to be a member of The Florida Bar at this time on this ground would be the equivalent of a permanent disbarment. This is not justified by the evidence.
In the other incident H.H.S. was acting as a party to a contract to purchase in the capacity of trustee and not as attorney for or a real estate broker for any party. There is no evidence that in the transaction H.H.S. was either engaged in the practice of law or serving as a real estate broker. Also there was no suggestion that H.H.S.' dealings with the sellers were other than arms-length dealings. H.H.S. testified that Batura assured him disclosure had been made to the sellers' attorney. There is no evidence or finding of fact that H.H.S. was not advised by Batura that disclosure had been made. In fact Batura testified that he advised sellers' attorney of his, Batura's, interests. This was denied by the attorney but his testimony does not controvert H.H.S.' statement that he had been so advised by Batura.
Even assuming that H.H.S. had a duty to make the disclosure, his conduct in the real estate transaction was not such that would be grounds for a disbarment of an attorney. No loss was sustained by any party to the real estate transaction.
The majority opinion says that the acts and conduct of H.H.S. would cause a reasonable man to have substantial doubts about H.H.S.' honesty, fairness, and respect for the rights of others and for the laws of the state and nation. Such conclusion was obviously garnered through infinite wisdom rather than the facts presented to the board. Cf. In re Eimers, 358 So.2d 7 (Fla. 1978).
This conclusion was controverted by the affidavits of fifteen residents of the county in which H.H.S. lived.
He moved to Brevard County in 1972 entering the title insurance business as the founder of Title Assurance and Escrow, Inc. He is a member of the bar of the state of Maryland and is in good standing. He served in the navy in World War II as a commissioned officer and served as a naval officer in the Korean War. After his separation from the navy, H.H.S. enrolled in Georgetown University Law School, Washington, D.C. He attended law school at night and worked during the day. He spent ten years with Vitro Corporation, becoming the head fiscal administrator officer at the Washington, D.C., locale, which, at the time, was doing business in the amount of twelve million to fifteen million dollars a year. In 1958 he became corporate counsel at the executive offices in New York City where he was responsible for all negotiations and relationships between Vitro Corporation of America and the United States government. He spent ten years in the fiscal, administrative, budgetary, and legal aspects of the corporation.
In 1962 he resigned from his corporate position and entered the private practice of law. In a few years he was invited to join a law firm and became a partner.
During the time that he failed to file his income tax return, H.H.S. was involved in marital difficulties. H.H.S. has never been convicted of any felony charge, nor has he been convicted of any other misdemeanor charges.
We are considering the future of an individual recognized as an attorney in good standing in the state of Maryland and acknowledged as a person of good character by fifteen citizens who have had an opportunity to observe his conduct. His title insurance business is successful.
The majority holds that the general requirement of "good moral character" is sufficiently definite so that they can pass judgment on this individual. It does not appear from the record that he has been guilty of any conduct or offense involving moral turpitude. We are confronted with only one issue: i.e., whether a majority of this *895 Court, as reasonable men, have substantial doubts about H.H.S.' honesty, fairness, and respect for the rights of others and for the laws of the state and nation.
As a "reasonable man" I have considered all of the facts, the good as well as the bad, and have no substantial doubts about H.H.S.' honesty, fairness, and respect for the rights of others and for the laws of the state and union.
BOYD, J., concurs.