IN RE: APPLICATION for Admission to the Bar of Arkansas OF Mark Ashley CROSSLEY

92-290                                                              839 S.W.2d 1

Supreme Court of Arkansas
Opinion delivered September 21, 1992
[Rehearing denied October 12, 1992.]

---

436

*Gibson & Gibson, P.A.*, by: *Bynum Gibson*, for appellant Mark Ashley Crossley.

*Hoover, Jacobs & Storey*, by: *Tucker Raney* and *Letty C. McAdams*, for appellee Board of Law Examiners.

ROBERT L. BROWN, Justice. This is an appeal from a decision by the Arkansas Board of Law Examiners denying the request of petitioner Mark Ashley Crossley, who is a licensed pharmacist and a law school graduate who has passed the Arkansas Bar examination, for admission to the Bar of Arkansas. Crossley raises several points which relate to the "moral character" standard set out in Rule XIII of the Rules Governing Admission to the Bar and to the process for deciding bar applications. We affirm the Board's decision to deny admission to Crossley.

The essential facts are these. Crossley was granted a Pharmacy License by the Arkansas State Board of Pharmacy in 1983. On May 2, 1988, he voluntarily entered a drug treatment program at Sparks Regional Medical Center in Fort Smith, from which he was discharged on May 26, 1988. He surrendered his pharmacy license that same month.

The record reveals that Crossley had a history of abusing alcohol and a variety of illegal drugs dating back to his junior-high-school years and that his problem began to intensify around 1985, when he and his first wife were divorced. Following his divorce, he unintentionally overdosed on drugs twice. According to Crossley, while serving at age 30 as chief pharmacist for the Van Buren County Hospital in Clinton in 1988, he began to use Demerol and morphine, and his use of those substances "got completely out of hand." His discharge summary from Sparks Regional Medical Center in May 1988 states that Crossley exhibited symptoms of "(1) narcotic dependence (Paradyne) (2) alcohol abuse (3) history of other chemical abuse."

In June 1988, following his discharge from the treatment center at Sparks, Crossley appeared before the Arkansas State Board of Pharmacy. He did not, at that time, request reinstatement of his pharmacist's license, and the Pharmacy Board

advised him that it would require documentation of his regular attendance at meetings of Narcotics Anonymous and Alcoholics Anonymous before it would consider the question of reinstatement.

On April 1, 1989, Crossley signed a continued-care contract with the Arkansas Pharmacy Support Group. That agreement set forth specific guidelines for his behavior, including abstinence from the use of mood-altering substances, participation in an after-care program for twelve months, monthly random urine screens, attendance at a minimum of two monthly NA/AA meetings, and attendance at quarterly meetings of the Pharmacy Support Group.

In the meantime, Crossley remarried and enrolled in law school at the University of Arkansas at Little Rock. On December 8, 1989, he requested that his pharmacy license be reinstated, pointing to his involvement with the Pharmacy Support Group as evidence of a changed direction. The Pharmacy Board approved the issuance of a temporary intern license, which entailed supervision and required Crossley to attend bi-monthly AA meetings as well as support group meetings.

Thereafter, Crossley continued in the Pharmacy Board's after-care program and remained subject to random urine screens. He next appeared before the Pharmacy Board on February 13, 1990, and again requested reinstatement of his pharmacy license. The Board gave its conditional assent and restored his license but stipulated that Crossley not work by himself, that he obtain additional continuing education hours, that he appear before the Pharmacy Board in June 1990, that he sign another continued-care contract with the Pharmacy Support Group, and that he follow an after-care program with urine monitoring.

While working as a security guard at a music concert in Little Rock in August 1990, Crossley was offered some cocaine. He used the drug, which was detected in his urine the next week during a random substance test. Despite the positive reading, representatives of Crossley's support group stated that the relapse was not a significant problem. At the Pharmacy Board meeting held on September 6, 1990, Crossley agreed not to practice pharmacy until he presented himself before the Board at

its February 1991 meeting. He also agreed to adhere to the requirements of the Pharmacy Support Group and to make periodic progress reports to the Pharmacy Board's executive director. Subsequently, during the 1990 Christmas holidays, Crossley took a drink of wine, which was a violation of his contract with the Pharmacy Support Group.

On December 26, 1990, Crossley filed an application for admission to the Arkansas Bar that consisted of a biographical questionnaire. He answered "No" to a query about whether he had ever suffered from or been treated for alcoholism and "Yes" to a question concerning treatment for drug abuse. Responding to a question on the termination or revocation of any other professional license, Crossley wrote: "I surrendered my Pharmacy License in May, 1988. My license was NOT terminated or revoked. I entered a drug treatment program at Sparks Regional Medical Center in Ft. Smith, AR voluntarily." He affirmed that disciplinary action had been taken against him and explained: "In September, 1990 the Board of Pharmacy requested that I refrain from practicing pharmacy until February, 1991 when I will meet with the Board to review my progress in my recovery program due to a relapse in August, 1990."

Appearing before the Pharmacy Board on February 14, 1991, Crossley requested that the Board allow him to resume his pharmacy practice. The minutes of the Pharmacy Board reflect that its members and its Executive Director, Dr. Lester Hosto, spoke at length with Crossley about his drug dependency. Crossley was advised that it was necessary for him to write a letter to the Pharmacy Board authorizing it to release his records and other requested information to the Arkansas Board of Law Examiners.

On February 25, 1991, Crossley, having completed law school, signed an acknowledgement which stated is understanding that he was being allowed to take the February 1991 Bar examination, but that "in accord with Rule 13 of the Rules Governing Admission to the Bar, the Arkansas Board of Law Examiners is continuing to investigate by qualifications for certification." Crossley circled "moral character" as the subject of inquiry. The form also stated that Crossley recognized that the Board of Law Examiners "reserves the right to withhold certifica-

tion of my application for admission to the Bar of Arkansas in accord with Rule 13 of the Rules Governing Admission to the Bar of Arkansas." Crossley passed the bar exam.

Crossley's application for admission to the Bar was reviewed by the chairman of the Board of Law Examiners, who was unable to determine Crossley's eligibility. Crossley was then informed that he was entitled to request a hearing, and he did so.

A hearing was conduced on June 27, 1991. Crossley, who appeared with his attorney, was questioned by a three-member panel appointed by the chairman of the Board of Law Examiners and by an evidence officer. Other witnesses were called in his behalf. A transcript of the hearing was then prepared and sent to the Board of Law Examiners, who, by a vote of nine to two, determined that Crossley was ineligible for admission. The decision submitted by the Arkansas State Board of Law Examiners on February 17, 1992, contained twenty-one findings of facts and conclusions and included the following: "Insufficient time has passed since the last 'relapse' for the Board to favorably consider Mr. Crossley's application."

Crossley filed a petition for rehearing or admission to the Bar on March 3, 1992. At a meeting on March 21, 1992, the Board of Law Examiners refused to consider the petition.

Crossley argues that the Law Examiners' adverse recommendation should not stand because his "conduct does not violate the good moral character definition that should be adopted by this Court for initial applicants to the Bar." More precisely, Crossley urges that his chemical addiction is a disease which is now under control and which has never led to acts of moral turpitude.

Rule XIII (A) of the Rules Governing Admission to the Bar states in part:

> In addition to meeting all other requirements of the rules governing admission to the Bar, every applicant for admission to practice by examination or reciprocity and every applicant for reinstatement of license to practice must be of good moral character and mentally and emotionally stable.

Crossley argues persuasively that he is afflicted by the

disease of chemical dependency. The evidence certainly points to that, and we agree with him that addiction to alcohol and drug substances is a disease. Unhappily, though, that conclusion on our part does not decide the matter, for our ultimate purpose in resolving admission questions is to assess an applicant's fitness to practice law and to protect the public's interest. *See Application of Taylor*, 647 P.2d 462 (Or. 1982).

■■ In Arkansas, we review bar admission and reinstatement cases *de novo* and will not reverse the findings of fact of the Law Examiners unless they are clearly erroneous. *In Re Petition for Reinstatement of Lee*, 305 Ark. 196, 806 S.W.2d 382 (1991); *Scales* v. *State Board of Law Examiners*, 282 Ark. 578, 669 S.W.2d 895 (1984). The applicant has the burden of proving eligibility and must do so by a preponderance of the evidence. *In Re Shannon*, 274 Ark. 106, 621 S.W.2d 853 (1981).

■ The test under Rule XIII is that the applicant "be of good moral character and mentally and emotionally stable." "Good moral character" is a highly subjective term which lends itself to myriad definitions and personal interpretations. As the Arizona Supreme Court observed: "[U]nfortunately for those who would like a black-letter rule, the concept of 'good moral character' escapes definition in the abstract. Instead, a particular case must be judged on its own merits, and an *ad hoc* determination must be made by the court." *Application of Klahr*, 433 P.2d 977, 979 (Ariz. 1967); *see also Application of Greenberg*, 614 P.2d 832 (Ariz. 1980). In the same vein, Supreme Court Justice Felix Frankfurter once remarked on the "shadowy rather than precise bounds" of the concept of "moral character." *Schware* v. *Board of Bar Examiners of New Mexico*, 353 U.S. 232, 249 (1957) (concurring opinion).

The United States Supreme Court also noted in 1957 that the term "good moral character" had been used for many years as a qualification for Bar membership and had been a "useful" tool in that regard. *Koningsberg* v. *State Bar of California*, 353 U.S. 252 (1957). "However," the Court declared, "the term, by itself, is usually ambiguous. It can be defined in an almost unlimited number of ways for any definition will necessarily reflect the attitudes, experiences, and prejudices of the defined. Such a vague qualification, which is easily adapted to fit personal views

and predilections, can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law." 353 U.S. at 263.

In *Koningsberg*, the Court defined moral character as "an absence of proven conduct or acts which have been historically considered as manifestations of 'moral turpitude.' " 353 U.S. at 263; *quoted in Reese* v. *Board of Commissioners of Alabama State Bar*, 379 So.2d 564, 569 (Ala. 1980) [law-school applicant prevailed in his application despite his having admitted to DWI and disorderly conduct charges]; *In Re Florida Board of Bar Examiners*, 373 So.2d 890 (Fla. 1979) [application denied due to applicant's failure to file federal income tax returns for three years].

Crossley cites us to a recent New Jersey case where the court determined that, despite the applicant's criminal history from 1969 to 1971 and his 1985 arrest on charges of possession of cocaine and paraphernalia (the charges were subsequently dropped on technicalities), the applicant deserved an opportunity to practice law. *Application of Strait*, 577 A.2d 149 (N.J. 1990). The court reached this decision by concluding that the record established that Strait had overcome his dependency on drugs and alcohol, that the addiction was the primary source of his problems with the law, and that his chances for sobriety were favorable.

There is no doubt, however, that chemical dependency is a factor to be weighed in assessing fitness to practice law. The Supreme Court of Minnesota has specifically addressed the question of "whether chemical dependency on alcohol is rationally related to fitness for the practice of law such that it can form the basis for preventing an otherwise qualified applicant from gaining admission to the bar." *In Re Haukebo*, 352 N.W.2d 752, 755 (Minn. 1984). That court recognized alcoholism as a disease and acknowledged its impact on the practice of law. It concluded that the matter should be remanded to the State Board of Law Examiners for a decision on whether the applicant had rehabilitated himself. In doing so, the court commented on alcoholism:

> It is not a mere pattern of voluntary conduct; neither is it an offense which necessarily involves moral turpitude or reflects on the individual's honesty, fairness, or respect for

the rights of others or for the law. It cannot be denied, however, and the Board well knows, that the disease of alcoholism is frequently a contributing factor to acts of attorney misconduct.

*Id.*

The West Virginia Supreme Court of Appeals made a similar observation in a recent case involving alcoholism, but the court affirmed the State Board's decision to deny the applicant permission to sit for the bar examination:

[W]e hold that since alcohol dependency can impact on an applicant's fitness to practice law, it is an appropriate factor to be considered by the Board of Law Examiners in ascertaining whether an applicant has proven good moral character sufficient to demonstrate his fitness and capacity to practice law in this State.

*Frasher* v. *West Virginia Board of Law Examiners*, 408 S.E.2d 675, 682 (W. Va. 1991).

In our own cases dealing with petitions for reinstatement to practice law, this court has adopted a case-by-case analysis in dealing with the moral character question. Rather than defining what "good moral character" *is*, we have cited examples of what it *is not. See In Re Petition for Reinstatement of Lee, supra* [dishonest receipt of money]; *Scales* v. *State Board of Law Examiners, supra* [lawyer repaid only a fraction of the amount he embezzled from a former client]; *In Re Shannon, supra* [lawyer made only partial restitution to the estate where he embezzled funds]. We have not confronted the issue of whether chemical dependency involving the use of illegal drugs disqualifies one from practicing law. We readily agree, however, that rather than moral turpitude, the issue surrounding chemical dependency is one of fitness to practice law.

In this case, Crossley had two episodes of relapse: the use of cocaine in August 1990, and the use of wine in December 1990. The use of cocaine we deem more significant not only because of its illegal status but also because of Crossley's attitude towards the relapse as exhibited at the Law Examiners' hearing:

Examiner: The Cocaine incident at the music festival,

did it not cross your mind that you were violating the criminal law of the State of Arkansas being in law school? Was that even a consideration? I don't know, I'm asking you.

The Witness: I don't really know how to explain that but no, sir, it did not. It just — it really didn't.

Perhaps Crossley's answer shows the extent of his disease, but it seems incredible that when he chose to use cocaine, he was oblivious to the fact that the was engaging in illegal activity.

This case boils down to whether Crossley has rehabilitated himself sufficiently to engage in the practice of law. Again, the burden of proving this falls on Crossley himself, and we cannot say that the Board of Law Examiners was wrong in concluding that he had not met his burden, particularly in light of his August 1990 relapse. Nor can we hold that the Board was clearly erroneous in any of its findings of fact.

■ Crossley also urges that the Law Examiners erred in refusing to reconsider his application on March 21, 1992. We do not agree. What then must Crossley show to establish rehabilitation? Certainly, an extended passage of time during which sobriety has been attained is a critical factor. At this writing, Crossley has been free of drug usage for slightly more than two years. A requirement that this sobriety be continued for at least another two years is not unreasonable in light of Crossley's history of drug and alcohol abuse between the ages of thirteen and thirty.

Expert evaluation in support of bar admission is also an important factor as are continued monitoring and support group activity. We note where the Pharmacy Board executive director, Dr. Lester Hosto, testified before the panel at the June 27, 1991 hearing that Crossley's disease was treatable and that "his ability to practice law would be just as good as his ability to practice pharmacy." We further note where Dr. Pat Chambers, who treated Crossley at Sparks Regional Medical Center, wrote to the Director of Professional Programs for this court relative to the applicant in February 1991:

As long as Mr. Crossley maintains himself in recovery as outlined above, I believe that his chemical dependency

will not impair his ability to competently represent the citizens of Arkansas as a lawyer. However, because this condition is not curable, there is a potential for relapse in the condition from time to time. Therefore, close monitoring of his condition would in my estimation be prudent.

Dr. Chambers' recommendation of close monitoring would entail continued urinalysis on a regular basis and intensive support group activity with groups like Narcotics Anonymous, Alcoholics Anonymous, and the Pharmacy Support Group. While we do not presume to prejudge a future application by Crossley, these factors are pertinent for consideration by the Board of Law Examiners.

■ Our position on fitness to practice law is summarized best by language from a decision by the Supreme Court of Oregon:

Applicant has submitted letters from several members of the profession in support of his application. We are also aware of applicant's academic accomplishments and other positive qualities. He has successfully completed three years of law school and passed the Bar examination. In a case of this sort, however, this court's primary responsibility is to the public, to see that those who are admitted to the Bar have the sense of ethical responsibility and the maturity of character to withstand the many temptations which they will confront in the practice of law. If we are not convinced that an applicant can withstand these temptations, we would be remiss to admit the applicant. Doubts of consequence must be resolved in favor of the protection of the public. [Citing authority.] In this case, . . . we have such doubt.

That is not to say that we shall forever remain unconvinced of reformation. Experience teaches that true reformation does occur. [Citing authority.] With the passage of time, this applicant may mature; his insight may develop; he may be able to show that good moral character requisite to admission to the Bar.

*Application of Taylor, supra,* 647 P.2d at 467-468; *see also Application of Cason,* 294 S.E.2d 520 (Ga. 1982).

The denial of the application of Crossley for admission to the Bar is affirmed without prejudice to reapply after a sufficient period of sustained sobriety has passed.

■ Finally, Crossley, after submission of his appeal and after oral argument of this case, filed a motion requesting that his medical records be sealed and that his identity in this case be anonymous. Historically, we have been loath to entertain motions which directly affect a case after submission except in the most exceptional circumstances. While the subject matter of this case is sensitive, we regard it as not so extraordinary as to warrant the special measures requested. Again, the issues in this case involve the protection of the public interest as well as Crossley's fitness to practice law. We see nothing to be gained by shrouding his efforts to attain a law license in secrecy.

Affirmed.