UNION PACIFIC RAILROAD COMPANY *v.* Chris BARBER
and Claudette Barber; Allied Waste Industries, Inc.

03-57 ˙149 W.E.3d 325

Supreme Court of Arkansas
Opinion delivered February 26, 2004

[Rehearing denied April 8, 2004.]

270

278

*William H. Sutton, Robert S. Shafer,* and *Scott H. Tucker,* for appellant.

*Robert L. Pottroff* and *Stephen W. Boyda*; *B. Michael Easley*; and *Gene Ludwig*, for appellees.

*McMath Woods*, by: *Paul E. Harrison*, for *amicus curiae* Railwatch, Inc., and The Kelly Waldron Memorial Foundation.

*Eubanks, Welch, Baker & Schulze*, by: *Morgan E. Welch*, for *amicus curiae* Arkansas Trial Lawyers Association.

ANNABELLE CLINTON IMBER, Justice. This case arises from a collision between a train owned and operated by Appellant Union Pacific Railroad Company (Union Pacific) and a garbage truck occupied by Appellee Chris Barber. A jury returned a verdict that found Union Pacific negligent and awarded Mr. Barber and his wife $5.1 million in compensatory damages. In addition, the jury concluded that Union Pacific acted with malice or reckless disregard and awarded the Barbers $25 million in punitive damages. We affirm the judgment.

At about 9:15 a.m, on January 19, 1998, a garbage truck owned by Browning-Ferris, Inc., was struck in St. Francis County by one of Union Pacific's freight trains. The garbage truck was traveling north over the railroad crossing as the train was traveling eastbound on the track. At the time of the accident, Charles Rolfe was driving the garbage truck while appellee Chris Barber sat in the passenger seat. The train struck the rear portion of the garbage truck on the driver's side, killing Mr. Rolfe and injuring Mr. Barber.

On October 19, 1998, Mr. Barber and his wife, Claudette Barber (hereinafter "the Barbers"), filed a complaint against Union Pacific Railroad Company, L.E. Piper, Jr., the train engineer at the time of the accident (hereinafter referred to collectively as "Union Pacific"), and Asplundh Brush Control Company. The complaint alleged that the accident was caused by Union Pacific's failure to control vegetation within its right-of-way in violation of Ark. Code Ann. § 23-12-201, failure to properly sound audible warning devices, failure to keep a proper lookout, and operating the train at an excessive speed for the conditions. In addition, the Barbers alleged that the crossing was abnormally dangerous. The Barbers later nonsuited the case against Asplundh pursuant to Arkansas Rule of Civil Procedure 41(a).

Meanwhile, Mr. Barber filed a workers' compensation claim against his employer, Allied Waste Industries, Inc.[1] In response to that claim, Mr. Barber was compensated in an amount exceeding $200,000.

Union Pacific answered the Barbers' complaint, denying the material allegations, and affirmatively asserting that the claim of excessive speed was preempted by federal law. Soon thereafter, the parties entered into settlement negotiations. After mediation, Union Pacific and the Barbers agreed to "settle around" Allied's workers' compensation lien.[2] The settlement called for Union Pacific to pay the Barbers $290,000 on or before February 18, 2000, and was contingent upon a court or the Workers' Compensation Commission approving the "settle around" provision.

A notice of intent to settle was forwarded to Allied, and on February 10, 2000, the parties filed a joint petition to approve settlement around the workers' compensation carrier. On February 28, 2000, Allied filed an objection to the parties settling around Allied's statutory lien pursuant to Ark. Code Ann. § 11-9-410 (Repl. 2002), and asserted that it was entitled to a lien on the proceeds of any settlement. In addition, Allied sought to intervene in the matter pursuant to Ark. R. Civ. P. 24 and Ark. Code Ann. § 11-9-410. A hearing by telephone conference on the settlement was set for February 28, 2000. Prior to the hearing, the Barbers sent a proposed order by facsimile to Union Pacific. According to the facsimile, counsel for the Barbers intended to submit the proposed order to the court after the telephone hearing. The record does not indicate whether the order was ever presented to the court; but, on March 3, 2000, the court filed a letter order that stated as follows:

> The court having considered Allied Waste Industries, Inc.'s objection to petition to approve settlement around workers' compensation carrier and all matters finds:
>
> That in accordance with Ark. Code Ann. § 11-9-410 and Arkansas case law that the Plaintiffs can settle around the W.C.C.

---

[1] At some point prior to Mr. Barber filing his workers' compensation claim Browning-Ferris, Inc., merged into Allied Waste Industries, Inc.

[2] To "settle around," the settlement agreement expressly reserved Allied's right to pursue its subrogation claim against Union Pacific to recover workers' compensation benefits paid to Mr. Barber.

> carrier if the settlement is approved by the court. However, the W.C.C. carrier will have a lien on the proceeds of the settlement.

In response to that letter order, the Barbers notified Union Pacific via facsimile of their intent to appeal the court's order.

At that point, and without an appeal, the parties continued to litigate the matter in the circuit court. Allied filed a complaint in intervention, which was answered by Union Pacific and the Barbers. The Barbers continued with discovery, requesting a second set of admissions, which request elicited an objection by Union Pacific in a conjunctive-motion seeking a protective order. On June 23, 2000, the court set May 29, 2001, as the trial date.

On February 12, 2001, the Barbers filed an amended complaint. In their amended complaint, the Barbers alleged that Union Pacific failed to maintain the track at the crossing to the Federal Railroad Administration's Class 4 standards, failed to issue a "slow order" calling for a speed restriction over that rail crossing, and requested punitive damages. Union Pacific filed a joint answer and motion to dismiss, denying the material allegations, and affirmatively pleading that the Barbers' claims on track maintenance and "slow orders" were preempted by federal law.

In a letter dated March 13, 2001, counsel for the Barbers proposed to start deposing witnesses after acknowledging that "[s]ince March 12th has come and gone, it appears we will be trying this case." On March 27, 2001, Union Pacific filed a motion to approve the settlement agreement procured on February 2, 2000. The Barbers responded by filing an opposing motion to withdraw their previous joint petition to settle around the workers' compensation carrier. The circuit court set a new trial date for January 7, 2002, and, by order dated August 6, 2001, denied Union Pacific's motion to approve the settlement agreement. On December 13, 2001, the court concluded that the case was not ready for trial because the case "had turned into, not an issue of what happened to whoever (sic) the poor party out there was, it's turned into a fuss between the lawyers on evidentiary issues." As a result, the trial was reset to begin on April 30, 2002.

Following several discovery disputes, the circuit court ruled on April 29, 2002, that the Barbers would be entitled to a jury instruction on spoliation of evidence. On April 30, 2002, the circuit court ruled on Union Pacific's various motions in limine, including a request that the court prohibit any evidence or

argument that the train was traveling at an excessive speed. The court granted the motion in limine as to the Barbers' excessive-speed claim on grounds of federal preemption, but denied the motion as to their claim of negligent failure to issue a "slow order."

At the close of the Barbers' case-in-chief, and again at the close of all the evidence, Union Pacific moved for a directed verdict on the Barbers' claims that the crossing was abnormally dangerous, that Union Pacific negligently failed to issue or to disclose a "slow order," and on the request for punitive damages. The court denied Union Pacific's directed-verdict motions. The case was bifurcated with the jury first deciding the issues of liability for negligence, compensatory damages, and liability for punitive damages. The matter of negligence was submitted to the jury on a general verdict form.

While the jury was deliberating on the issues of negligence liability, punitive liability, and compensatory damages, counsel for Union Pacific observed Attorney B. Michael Easley, counsel for the Barbers, pressing his ear against the deliberation room. Although Union Pacific's counsel promptly confronted Attorney Easley, causing him to remove his ear from the jury-room door, neither counsel for Union Pacific nor counsel for the Barbers brought the incident to the court's attention at that time.

The jury returned a verdict in favor of L. E. Piper, the locomotive engineer, but found for the Barbers on their complaint against Union Pacific and awarded compensatory damages in the amount of $5,000,000 to Mr. Barber and $100,000 to his wife. In response to a special interrogatory, the jury found that Union Pacific acted with malice or in reckless disregard of the consequences, thereby establishing liability for a punitive damages award. The amount of punitive damages was set to be determined by the jury in the second phase of the bifurcated trial.

Once the jury verdict was returned and read by the court, Union Pacific informed the court of Attorney Easley's conduct during jury deliberations and moved for a mistrial. The circuit court denied the request for a mistrial, but ruled that the only additional proof it would allow the Barbers to present during the second phase of the trial would be evidence of Union Pacific's net worth. Without presenting argument of any kind, the parties stipulated to the net worth of Union Pacific at $9.6 billion. That

figure was written on a board and displayed to the jury at which time the jury retired to deliberate on the amount of the punitive damages award.

While the jury deliberated, the trial judge called the attorneys into his chamber for a discussion off the record. Following that discussion, the court went on the record under a conditional seal, whereupon Attorney Easley expressed remorse for his conduct in pressing his ear to the jury-room door during deliberations and submitted himself to sanctions. After considering the events and the manner in which the punitive damages portion of the case had been handled, the court concluded that Union Pacific suffered no prejudice in the matter. Defense counsel made no comments on the record. The court reiterated that there would be no basis for granting a mistrial if Union Pacific renewed its motion.

The jury ultimately reached a verdict and assessed punitive damages against Union Pacific in the amount of $25,000,000. Union Pacific then filed a motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial or a remittitur of the punitive damages award. The Barbers responded and also requested sanctions in connection with alleged discovery violations and spoliation of evidence. All motions were denied by the court, and the parties are now before this court on appeal.[3]

## I. Mistrial

Union Pacific's first point on appeal stems from opposing counsel's improper actions in pressing his ear to the door of the jury-deliberation room. After counsel for Union Pacific witnessed Attorney Easley's misconduct, he withheld disclosure of the information until the jury returned an unfavorable verdict. At that point, Union Pacific brought the misconduct to the attention of the circuit court. The trial judge was stunned by counsel's actions but ruled that the jury verdict had not been compromised. Union Pacific argued that because the trial would have to proceed into a second phase on punitive damages, a mistrial was necessary. The circuit court refused to grant a mistrial; instead, it attempted to avoid any prejudice by limiting the presentation of evidence during the second phase of the trial to a stipulation regarding

---

[3] In addition to the briefs filed by Union Pacific as appellant, and the Barbers as appellees, *amicus curiae* briefs have been filed by the Arkansas Trial Lawyers Association, Railwatch, Inc., and The Kelly Waldron Memorial Foundation.

Union Pacific's net worth. Specifically, the circuit court instructed the jury that it would be considering the punitive damages award against Union Pacific. Counsel for the Barbers then explained to the jury that the parties stipulated that Union Pacific's net worth was $9.6 billion. That figure was written on a board, and the jury was informed the net worth figure equaled Union Pacific's total assets minus its total debts. Neither party made any other comments or arguments to the jury. With only the circuit court's instructions, a figure of $9.6 billion, and an explanation of how that figure was calculated, the jury retired to deliberate. On appeal, Union Pacific argues that the trial court erred in denying its motion for a mistrial or, in the alternative, its motion for a new trial.[4]

It is well settled in Arkansas that a mistrial is a drastic and extreme remedy that should be granted only when there has been error so prejudicial that justice cannot be served by continuing the trial or when the fundamental fairness of the trial itself has been manifestly affected. *Farm Bureau Mut. Ins. Co. v. Foote,* 341 Ark. 105, 14 S.W.3d 512 (2000). The trial judge is given wide latitude to determine whether a mistrial is warranted. *Engram v. State,* 341 Ark. 196, 15 S.W.3d 678 (2000). The trial court has wide discretion in granting or denying a motion for mistrial, and that decision will not be disturbed on appeal absent an abuse of discretion or manifest prejudice to the movant. *Southern Farm Bureau Cas. Ins. Co. v. Daggett,* 354 Ark. 112, 118 S.W.3d 525 (Sept. 25, 2003). In addition, to preserve a point for appeal, a proper objection must be asserted at the first opportunity. *Edwards v. Stills,* 335 Ark. 470, 984 S.W.2d 366 (1998). Likewise, motions for mistrial must be made at the first opportunity. *Id.*

In *Arkansas Central R.R. Co. v. Morgan,* 129 Ark. 67, 195 S.W. 402 (1917), the jury had reached a stalemate in its deliberations, whereupon they were permitted to separate after the usual admonition of the court against talking to anyone about the case or permitting anyone to talk to them. One of the attorneys in the case escorted a juror to the attorney's home, where the juror left his

---

[4] A motion for new trial is governed by Ark. R. Civ. P. 59 (2003). The rule specifically provides the grounds on which a new trial may be based. Ark. R. Civ. P. 59 (2003). Union Pacific fails to explain the basis, independent of its motion for a mistrial, for its motion for new trial. Accordingly, we treat this point on appeal as a claim of error with respect to the circuit court's ruling on the motion for mistrial with the relief requested being a new trial.

young unbroken horse, and the attorney loaned him an older, gentler horse. *Id.* Opposing counsel witnessed the events as they transpired, but made no complaint to the court until after the jury reached a verdict. *Id.* This court recognized that the attorney's conduct was improper but declined to reverse stating:

> The litigant should, in fairness, make his complaint to the court as soon as the information is obtained . . . . And if there is to be a mistrial in such cases, it should come when the prejudicial incident is discovered and the court has determined that the integrity of the trial has been destroyed . . . . Having taken its chance on the verdict of the jury by failing to speak when it should have spoken, we will not disturb the finding of the court, upholding the integrity of the verdict.

*Arkansas Central R.R. Co v. Morgan,* 129 Ark. at 73-74, 195 S.W. at 405 (1917). This court's ruling over eighty years ago comports with our current rule that mandates a motion for mistrial be made at the first opportunity.

In this case, the actions of counsel for Union Pacific were similar to those of appellant's counsel in *Arkansas Central R.R. Co v. Morgan, supra.* That is, after witnessing the wrongdoing, counsel gambled on receiving a favorable jury verdict before informing the court of the misconduct. In oral arguments, Union Pacific conceded that it did not inform the trial court of the attorney misconduct at the first available opportunity. We explained that counsel is required to advise the court of an attorney's misconduct as soon as the information is discovered so that the court may inquire into the incident and remove any prejudice. *Arkansas Central R.R. Co v. Morgan, supra.* Had counsel immediately brought Attorney Easley before the court and explained the situation, the court could have separated Attorney Easley from co-counsel for the Barbers, thereby insulating him from further participation in the case and removing any prejudice that may have resulted from his improper conduct.

Instead, as a result of Union Pacific's decision to take a chance on the result of the verdict, the trial court concluded that the second phase of the trial needed to be cut short in order to prevent any possible prejudice. In the trial judge's own words, "I really thought this thing needed to be pretty well shut down and no further arguments made." The law is well settled that motions

for mistrial must be made at the first opportunity. *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000). The policy reason behind this rule is that a trial court should be given an opportunity to correct any error early in the trial, perhaps before any prejudice occurs. *Id.* We note that other jurisdictions have come to a similar conclusion when counsel gambles on a favorable jury verdict before bringing the issue to the court's attention. *See Bolton v. Tesoro Petroleum Corp.*, 871 F.2d 1266, 1276-77 (5th Cir.1989) (failure to request a mistrial on claim of attorney misconduct before the jury deliberations showed that the appellants "gambled" on the jury verdict, and weighed against granting a new trial); *Raymond v. Southern Pac. Co.*, 259 Or. 629 (1971) (holding that a party has no right to gamble on the outcome of the case and to avail himself of the irregularity or misconduct if a decision is adverse to him). The Oregon Supreme Court explained that the public's interest in the efficient use of judicial time and in the finality of the judicial process does not permit a party to gamble on a verdict before making a motion for mistrial. *Raymond v. Southern Pac. Co., supra.* We hold that by waiting for the jury to return a verdict and failing to bring the matter to the circuit court's attention at the first opportunity, Union Pacific failed to preserve this argument for appeal.[5]

## II. Prior Near Misses

In its second point on appeal, Union Pacific argues that the circuit court erred in admitting evidence of prior near misses at the track crossing where the accident occurred. Union Pacific makes a two-pronged attack on the use of the prior near-miss evidence. First, Union Pacific requests that we endorse a rule that prior near-miss evidence be excluded as a matter of law in railroad-grade-crossing cases. Second, Union Pacific contends that the circuit court erred in admitting the near-miss evidence because the Barbers failed to offer sufficient proof of substantial similarity in conditions. The Arkansas Trial Lawyers Association, through its *amicus curiae* brief, has urged us to decline Union Pacific's request that near-miss evidence be declared inadmissable as a matter of law.

---

[5] In view of Attorney Easley's conduct during jury deliberations, a copy of this opinion will be forwarded to the Committee on Professional Conduct.

## A. Exclusion as a Matter of Law

Union Pacific recognizes that we have already enunciated a rule that near-miss evidence is admissible "upon a showing that the events arose out of the same or substantially similar circumstances." *See Carter v. Missouri Pacific R.R. Co.*, 284 Ark. 278, 681 S.W.2d 314 (1984) (quoting *Fulwider v. Woods*, 249 Ark. 776, 461 S.W.2d 581 (1971)). Nonetheless, we are asked to overrule that case because near-miss evidence is inherently unreliable and unduly prejudicial, and, thus, should be excluded as a matter of law.

■■ No case has been cited, and we can find none, that supports a *per se* exclusion of near-miss evidence. The admissibility of prior similar occurrences has been commonly accepted in Arkansas for many years. *See Ford Motor Co. v. Massey*, 313 Ark. 345, 855 S.W.2d 897 (1993); *Westark Specialties, Inc. v. Stouffer Family, Ltd.*, 310 Ark. 225, 836 S.W.2d 354 (1992); *Fraser v. Harp's Food Stores, Inc.*, 290 Ark. 186, 718 S.W.2d 92 (1986); *Carter v. Missouri Pacific Railroad Co.*, 284 Ark. 278, 681 S.W.2d 314 (1984); *Houston General Ins. Co. v. Arkansas Louisiana Gas Co.*, 267 Ark. 544, 592 S.W.2d 445 (1980); *Arkansas Power & Light Co. v. Johnson*, 260 Ark. 237, 538 S.W.2d 541 (1976); *Fulwider v. Woods*, 249 Ark. 776, 461 S.W.2d 581 (1971). In addition, it is generally recognized that evidence of prior similar occurrences is admissible with a showing of sufficient similarity in circumstances. *See McCormick on Evidence*, 5th ed. 1999 p. 703-04 § 200. Thus, Union Pacific presses this court to pioneer a *per se* exclusion in the face of a sound majority position. While we are urged to adopt a *per se* rule in railroad-crossing cases, the supporting theory of unreliability is not so limited. Evidence of prior similar occurrences in railroad-crossing cases is not any less reliable than prior similar occurrences in any other context.

■ Furthermore, a necessary predicate to the adoption of a *per se* exclusion rule would be a decision by this court to break with our prior precedent in *Carter v. Missouri Pacific Railroad Co.*, 284 Ark. 278, 681 S.W.2d 314 (1984). We have held that there is a strong presumption of the validity of prior decisions. *Bharodia v. Pledger*, 340 Ark. 547, 11 S.W.3d 540 (2000). Although we do have the power to overrule previous decisions, it is necessary as a matter of public policy to uphold prior decisions unless great injury or injustice would result. *Id.* The policy behind *stare decisis* is to lend predictability and stability to the law. *Id.* In matters of practice,

adherence by a court to its own decisions is necessary and proper for the regularity and uniformity of practice, and that litigants may know with certainty the rules by which they must be governed in the conducting of their cases. *Id*. Precedent governs until it gives a result so patently wrong, so manifestly unjust, that a break becomes unavoidable. *Id*.

██ Union Pacific asserts that "a near miss leaves no record of the incident." We recognize that there are situations in which a near miss will occur leaving no tangible record of the incident. Yet, this does not mean that a near miss can never be verified or documented. For example, there will be occasions when the near miss is reported to the police, the railroad, or some other agency. Under the rule proposed by Union Pacific, near-miss evidence would be inadmissible regardless of its veracity. The admission of this evidence is considered on a case-by-case basis and the burden rests on the party offering the evidence to prove that the necessary similarity of conditions exists. *Westark Specialties, Inc. v. Stouffer Family, Ltd.*, 310 Ark. 225, 836 S.W.2d 354 (1992). Union Pacific has failed to demonstrate that allowing near-miss testimony into evidence gives rise to a result so patently wrong, so manifestly unjust, that a break in precedent is warranted. Accordingly, we decline to depart from our holding in *Carter v. Missouri Pacific R.R. Co., supra.*

### B. Substantial Similarity of Conditions

Prior to trial, Union Pacific moved in limine to prevent any evidence of near misses at the crossing where the accident occurred. The court ruled that it would allow evidence of near misses provided that they occurred within months of the accident. At trial, the Barbers introduced testimony by four witnesses about prior near misses. Union Pacific contends that the prior near-miss testimony elicited at trial did not arise out of circumstances substantially similar to the circumstances of the accident on January 19, 1998, when the garbage truck occupied by Mr. Barber was struck by one of Union Pacific's freight trains.

██ The general rule with respect to the admissibility of evidence of similar occurrences is that it is admissible only upon a showing that the events arose out of the same or substantially similar circumstances. *Ford Motor Co. v. Massey*, 313 Ark. 345, 855 S.W.2d 897 (1993). The burden rests on the party offering the

evidence to prove that the necessary similarity of conditions exists. *Id.* The relevancy of such evidence is within the trial judge's discretion, subject to reversal only if an abuse of discretion is demonstrated. *Id.* In *Carter v. Missouri Pacific Railroad Co.*, 284 Ark. 278, 681 S.W.2d 314 (1984), we upheld a trial court's ruling to exclude evidence of two prior near-misses. We concluded that the circumstances were not substantially similar because the flashing lights at the crossing had changed. *Id.* In determining the admissibility of prior similar occurrences, the critical question is whether the similarity of the circumstances makes it reasonable and probable that the same cause existed to produce the accident as did the near misses. *See, e.g., Chicago, R.I. & P.R. Co. v. Lynch*, 246 Ark 1282, 441 S.W.2d 793 (1969).

Whether an occurrence is substantially similar to the matter at hand depends on the underlying theory of the case. *Ford Motor Co. v. Massey*, 313 Ark. 345, 855 S.W.2d 897 (1993). For example, evidence submitted to demonstrate a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury. *Id.* However, the requirement of substantial similarity is relaxed when the evidence of other incidents is used to show notice or awareness of a potential defect in a product. *Id.* The theory of the Barbers' case was that the crossing was so overgrown with vegetation to the east that drivers attempting to cross could not see to the east without placing their vehicles in the zone of danger immediately adjacent to the track.

According to the Barbers, the circumstances that caused the accident in this case are simple. As the garbage truck approached the crossing headed north, the driver looked eastward for a train. By the time the truck's occupants were able to get a clear view to the east, the garbage truck was already at the crossing as a train came into view from the west. The Barbers asserted that due to overgrown vegetation on the south side of the train tracks at County Road Crossing 123, a northbound traveler would be unable to check safely for trains before attempting to cross. They also claimed that the engineer's failure to sound the train's whistle and bell as it approached the crossing exacerbated the situation.

The near-miss evidence permitted by the circuit court may be summarized as follows. Susan Thweatt testified that she used the crossing every Sunday to get to church and occasionally to run an errand. Between November and December of 1997, Susan was

traveling to church with her husband, Vernon Thweatt, and her two daughters. She was in the backseat with one of her daughters, and Vernon was driving the car southbound. As they approached Crossing 123, Vernon looked both ways and attempted to cross the tracks. At the same time, Susan looked to the east and saw a westbound train approaching. She yelled at her husband, he immediately braked, and then backed up until the train passed. Susan was unable to identify the train as either a Union Pacific or Burlington Northern train and never made a complaint to the railroad.

Vernon Thweatt testified about the same incident. He stated that the vegetation was overgrown at Crossing 123 and that he used it about four times per week. At the time of the incident, he was driving south towards the crossing with his wife and two children in the car. Vernon first checked to see that the east was clear and then turned to the west. As he was looking to the west, his wife screamed that a train was approaching from the east. He immediately applied his brakes at which point his bumper was within ten feet of the track. Vernon testified that the train did not sound its whistle or bell at the crossing. Vernon was also unable to identify the train as either a Union Pacific or Burlington Northern train and never made a complaint to the railroad.

Troy Meredith testified that he traveled north over Crossing 123 several times on his way to sites where he searched for arrow heads. Mr. Meredith confirmed that the brush and shrubbery on the south side of the track blocked his view to the east as he traveled north. He had an incident in the fall of 1997 at Crossing 123 while traveling north over the tracks where he had to "goose [his] car and jump across the track in order to keep from getting hit." As he approached the crossing, he first looked to his west. When he looked to the east, the brush and shrubbery blocked his view. He continued to move forward looking to the east and by the time he could see the westbound train he was in a position where the train would have hit him if he did not continue across the tracks.

Lastly, Ray Thweatt testified that he had been using Crossing 123 for fifty to sixty years. Ray also confirmed that the vegetation to the east blocked his view of the track. Twice in 1997, while traveling north over the crossing, he got so close to the tracks that he was startled when he finally saw an eastbound train.

In this case, Mr. Barber's accident resulted as the Union Pacific train traveled east and the garbage truck traveled

north over the crossing. Susan and Vernon Thweatt's near miss stemmed from a southbound approach to the crossing and a westbound train. Mr. Meredith's incident, on the other hand, occurred while he traveled north over the crossing and the train traveled west. In *First Security Bank v. Union Pac. R.R. Co.*, 152 F.3d 877 (8th Cir. 1998), the Eighth Circuit Court of Appeals concluded that the trial court did not err in excluding prior accidents where the drivers and the plaintiff were traveling in opposite directions, and, thus, had entirely different perspectives of the crossing. Likewise, Susan and Vernon Thweatt's view of the crossing from the north side was entirely different from the garbage truck driver's view on the south side of the crossing. The vegetation on the north side of the track has little relevance in determining a view from the south side of the crossing. We conclude that the trial court abused its discretion in admitting Susan and Vernon's testimony.

■ Nonetheless, the danger complained of stemmed from overgrown vegetation on the south side of the track. The cause of the accident was impaired visibility to northbound travelers as a result of overgrown vegetation on the south side of the track. For both Mr. Meredith and Mr. Barber, the view to the east was obscured by the vegetation on the south side of the track as they approached the crossing heading north. One difference in the circumstances of the accident and Mr. Meredith's near miss is that the trains were traveling in different directions. The issue here, however, is whether the vegetation on the south side of the track was a danger to northbound travelers regardless of which direction the train was traveling. Mr. Meredith's testimony reveals that he and Mr. Barber were in a substantially similar circumstance — the drivers in both vehicles had to inch forward to look east down the track for a train. Likewise, Roy Thweatt's near miss was caused by overgrown vegetation on the south side of the track obscuring his view to the east. Due to the high degree of similarity, we cannot conclude that the circuit court abused its discretion in admitting the near-miss testimony of Troy Meredith and Roy Thweatt.

■ ■ Union Pacific also contends that the trial court erred because none of the parties could identify the near-miss trains as Union Pacific trains. As such, Union Pacific argues that the evidence is irrelevant to show notice of a defect or condition. Evidence of similar occurrences is admissible when the notice of a

danger or defect is in issue. *Fraser v. Harp's Food Stores, Inc.*, 290 Ark. 186. 718 S.W.2d 92 (1986). Evidence of similar occurrences is also admissible to demonstrate a dangerous condition. *Ford Motor Co. v. Massey, supra.* As already stated, the theory of the Barbers' case was that the crossing was so overgrown with vegetation on the south side of the track that drivers attempting to cross could not see to the east without placing their vehicles in the zone of danger immediately adjacent to the track. Under this theory, notice is not relevant; rather, the testimony of Troy Meredith and Roy Thweatt was properly admitted to demonstrate a dangerous condition.

In sum, while the circuit court abused its discretion in admitting Vernon and Susan Thweatt's near-miss testimony, we will not reverse a trial court's ruling on evidentiary matters absent a showing of prejudice. *Dodson v. Allstate Ins. Co.*, 345 Ark. 430 47 S.W.3d 866 (2001). Evidentiary error may not be predicated upon a ruling that admits evidence unless it affects a substantial right of the party. Ark. R. Evid. 103(a) (2003); Luedemann v. Wade, 323 Ark. 161, 913 S.W.2d 773 (1996). We have repeatedly held that an evidentiary error is harmless if the same or similar evidence is otherwise introduced at the trial. *Luedemann v. Wade, supra; Williams v. Southwestern Bell*, 319 Ark. 626, 893 S.W.2d 770 (1995); *Shamlin v. Shuffield*, 302 Ark. 164, 787 S.W.2d 687 (1990); *Thompson v. AAA Lumber Co.*, 245 Ark. 518, 432 S.W.2d 873 (1968). In light of the other near-miss evidence that was properly admitted at trial, we cannot say that Vernon and Susan Thweatt's testimony, which was merely cumulative, resulted in prejudice to Union Pacific. Accordingly, we affirm on this point.

### III. Directed Verdict

For its third point on appeal, Union Pacific contends that the circuit court erred in denying its directed-verdict motions on the theory that Union Pacific negligently failed to issue a slow order and on the theory that the crossing was abnormally dangerous. At trial, the Barbers premised their claim of negligence on several theories:

(1) The violation of an Arkansas statute requiring a railroad to maintain its right-of-way free of vegetation;

(2) The presence of an abnormally dangerous crossing;

(3) The failure to sound the train's audible warning devices;

(4) The failure to keep a proper lookout; and

(5) The violation of federal regulations requiring a railroad to instruct its employees concerning its code of operating rules, time tables, and time table special instructions.

With the five theories before them, the jury was given a general verdict form on the claim of negligence.

■■■ When the jury's verdict is rendered on a general verdict form, it is an indivisible entity or, in other words, a finding upon the whole case. *South Cent. Arkansas Elec. Co-op. v. Buck*, 354 Ark. 11, 117 S.W.3d 591 (2003). This court will not speculate on what the jury found where a general jury verdict is used. *Id.* When special interrogatories concerning liability or damages are not requested, and this court is left in the position of not knowing the basis for the jury's verdict, we will neither question nor theorize about the jury's findings. *Hyden v. Highcouch, Inc.*, 353 Ark. 609, 110 S.W.3d 760 (2003).

■■ In this case, Union Pacific does not challenge the sufficiency of the evidence to support the general verdict of negligence. Instead, it challenges the sufficiency of the evidence on two of several theories that support the general verdict. We cannot determine, and we will not speculate, upon which theory the general verdict of negligence was premised. The evidence in this case reveals that the vegetation at Crossing 123 was severely overgrown. The overgrown vegetation on the south side of the train tracks blocked the view of anyone driving north over the crossing. In addition, drivers had to inch forward to a point where their vehicles were almost touching the track in order to get a clear view down the track. Moreover, by the time a person was able to adequately check the track for trains, he or she was in the zone of danger. The testimony supports a finding that these conditions caused the garbage truck to be hit by the Union Pacific freight train. Here, the jury could have based its verdict of negligence on the Barbers' theory that Union Pacific failed to properly maintain the vegetation at Crossing 123. Hence, we must affirm. *See, e.g., Union Pacific R.R. Co. v. Sharp*, 330 Ark. 174, 952 S.W.2d 658 (1997); *see also South Beach Beverage Co. v. Harris Brands, Inc.*, 355 Ark. 347, 138 S.W.3d 102 (2003); *Hyden v. Highcouch, supra.*

■■■ When presented with this question at oral argument, Union Pacific cited our decision in *Missouri Pacific Railroad v.*

*Mackey*, 297 Ark. 137, 760 S.W.2d 59 (1988), for the proposition that a case must be reversed when a jury is presented with several theories and asked to render a general verdict. In that case, we found prejudicial error where the circuit court gave the jury an inapplicable instruction. Indeed, we have consistently held that we will presume prejudice from the giving of an erroneous instruction, unless rendered harmless by other factors. *See Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003); *Long v. Lampton*, 324 Ark. 511, 922 S.W.2d 692 (1996); *Davis v. Davis*, 313 Ark. 549, 856 S.W.2d 284 (1993); *MIC v. Barrett*, 313 Ark. 527, 855 S.W.2d 326 (1993). However, we have made a distinction between contesting the trial court's decision to give a jury instruction on one particular theory of negligence, and challenging the sufficiency of the evidence to support a general verdict of negligence. *See Union Pacific R.R. Co. v. Sharp*, 330 Ark. 174, 952 S.W.2d 658 (1997). Here, Union Pacific challenges the sufficiency of the evidence to support two theories of negligence but does not challenge any of the jury instructions given by the trial court. Accordingly, we do not address the propriety of any instruction, and because we conclude that there was sufficient evidence of negligence, we are unwilling to speculate upon which theory of negligence the jury premised its verdict.[6]

## *IV. Punitive Damages*

For its fourth point on appeal, Union Pacific attacks both the propriety of awarding punitive damages and the amount of punitive damages. As a threshold matter, the Barbers contend that Union Pacific waived any challenge to the sufficiency of the evidence on punitive damages because Union Pacific failed to move for a directed verdict at the close of all the evidence. We hold that Union Pacific properly preserved this point for appeal, that there is sufficient evidence to warrant an award of punitive damages, and that the award in this case is not excessive.

---

[6] We note that after submission of the appeal and oral argument, Union Pacific filed a motion to submit supplemental authorities. We denied the motion on February 5, 2004. Historically, we have been loath to entertain motions which directly affect a case after submission except in the most exceptional circumstances. We do not regard this situation to be so extraordinary as to warrant the special measures requested. *See In re Crossley*, 310 Ark. 435, 839 S.W.2d 1 (1992).

At the close of the plaintiff's case-in-chief, and again at the close of all the evidence in connection with liability, Union Pacific properly moved for a directed verdict on the issue of punitive damages. Union Pacific did not, however, move for a directed verdict at the close of the evidence in the second phase of the trial on punitive damages. This second phase occurred after the jury had determined that Union Pacific was negligent, that it acted with malice or reckless disregard of the consequences, and assessed compensatory damages. For support, the Barbers cite *Advocat v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003), where we stated "the conclusion of all the evidence" occurs after the plaintiff's rebuttal evidence. Here, there was no rebuttal evidence and Union Pacific moved for a directed verdict at the close of all the evidence in connection with liability for punitive damages.

The purpose of a motion for directed verdict is to provide a procedure for determining whether the plaintiff has met the burden of establishing a *prima facie* case. *Wal-Mart Stores, Inc. v. Tucker*, 353 Ark. 730, 120 S.W.3d 61 (2003). A plaintiff need not establish a *prima facie* case in second phase of a bifurcated trial where only the amount of punitive damages remains to be decided. Thus, it is unnecessary for a defendant to move for a directed verdict as to liability after a jury has determined liability. Union Pacific has preserved its challenge to the sufficiency of the evidence to support an award of punitive damages by properly moving for a directed verdict on that issue at the close of all the evidence submitted in the liability phase of the trial.

### A. Sufficient Evidence of Punitive Damages

We review the denial of a motion for directed verdict to determine if the jury verdict is supported by substantial evidence. *D'Arbonne Const. Co., Inc. v. Foster*, 354 Ark. 304, 123 S.W.3d 894 (2003). Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty, and it must force the mind to pass beyond mere suspicion or conjecture. *Id.* When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered, and we give that evidence the highest probative value. *Id.* A motion for directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be

set aside. *Id.* A motion for directed verdict should be denied when there is a conflict in the evidence, or when the evidence is such that fair-minded people might reach different conclusions. *Id.*

 We have recently set out the standard for determining whether there is sufficient evidence to support an award of punitive damages in a negligence case:

> This court has said that an award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred. *Stein v. Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992); *Missouri Pacific Railroad v. Mackey*, 297 Ark. 137, 760 S.W.2d 59 (1988); *National By-Products, Inc. v. Searcy House Moving Company, Inc.*, 292 Ark. 491, 731 S.W.2d 194 (1987). In other words, in order to support this element of damages by way of punishment, it must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred. *Mackey*, 297 Ark. at 145, 760 S.W.2d at 63; *National By-Products, Inc.*, 292 Ark. at 494, 731 S.W.2d at 196. In order to warrant a submission of the question of punitive damages, there must be an element of willfulness or such reckless conduct on the part of the defendant as is equivalent thereto. *Dalrymple v. Fields*, 276 Ark. 185, 188, 633 S.W.2d 362, 364 (1982)(quoting *Hodges v. Smith*, 175 Ark. 101, 293 S.W.2d 1023 (1927)).

*D'Arbonne Const. Co., Inc.* v. *Foster*, 354 Ark. at 308, 123 S.W.3d at 898 (2003). The Eighth Circuit Court of Appeals has recognized that the critical inquiry is to determine whether there is evidence that a party likely knew or ought to have known, in light of the surrounding circumstances, that his conduct would naturally or probably result in injury, and that he continued such conduct in reckless disregard of the consequences from which malice could be inferred. *See Aircraft Accident at Little Rock v. American Airlines, Inc.*, 351 F.3d 874 (8th Cir. 2003) (citing *D'Arbonne Const. Co., Inc. v. Foster*, 354 Ark. 304, 123 S.W.3d 894 (2003)).

The evidence supporting an award of punitive damages, viewed in the light most favorable to the Barbers, is as follows. Willie Savage, a twenty-six year veteran of the railroad as a track-man, assistant foreman, and a foreman, testified for the

Barbers at trial. Just before Southern Pacific Railroad's merger with Union Pacific in September 1996, he was working for Southern Pacific as a tie-gang foreman. According to Mr. Savage, a track inspector or road master would mark railroad ties that needed replacement and then a tie-gang would follow up replacing the bad ties. Savage explained that the tie-replacement was done to keep the track maintained as a sixty-mile-per-hour track. However, after Union Pacific took over the tracks, and prior to reaching the 123 Crossing, the railroad had stopped replacing all the bad ties and instituted a "cluster-buster" tie replacement program. In a cluster-buster, the tie-gang would only replace one or two ties in a string of bad ties. Mr. Savage explained that the railroad then issued a "slow order" for the portions of track where the cluster-buster replacement was being performed.

In connection with his work as a tie-gang foreman, Mr. Savage complained to his supervisor, Mac McCartney, about the 123 Crossing. Mr. McCartney went to the crossing, but stated that he was not in charge of fixing crossings. Mr. Savage was concerned that the overgrown vegetation at the crossing would prevent his men from seeing a train and that one of his vehicles crossing the tracks would get hit by a train. Mr. McCartney suggested that Mr. Savage place a flagger at the crossing before they attempted to cross it. According to Mr. Savage, one or two men would stand at the crossing and direct the vehicles to cross when it was safe. He also testified that in working for Union Pacific there was never any response to complaints about overgrown vegetation.

Carl Jones, another garbage truck driver, testified that he had experienced problems with the overgrown vegetation at Crossing 123. Mr. Jones attempted to contact Union Pacific in April 1997 to inform them about the problem. He made between seven and ten complaints by phone to Union Pacific regarding the 123 Crossing. In addition, Mr. Jones flagged down a Union Pacific worker on the road and complained that the vegetation at Crossing 123 was life threatening.

Donald DePriest, a retired locomotive engineer, locomotive fireman, and brakeman also testified for the plaintiffs. He worked for the railroad from 1962 through 2000. Mr. DePriest testified that while he worked as locomotive engineer for Union Pacific he informed the train master, Tommy Stokes, and the train safety committee that the 123 Crossing was a hazard to the railroad employees and the public because there was a danger of hitting a vehicle at the crossing.

 ·Mayor Willetta Carroll of Palestine testified regarding her communications with Union Pacific. In 1997, Mayor Carroll contacted various personnel with Union Pacific concerning the track going through Crossing 123, including Vice President Jack Kyle, David Peterson, and Arkansas Grade Crossing Safety Coordinator Larry Hatley. She told these persons that Crossing 123 was overgrown and unsafe.

▆▆▆ In addition to considering the direct evidence that Union Pacific was put on notice that a life threatening condition existed at Crossing 123, the jury in this case was given an instruction on spoliation of evidence, which stated in part as follows: "In this case, the plaintiffs contend that by intentional conduct the defendant railroad failed to preserve voice tapes and track inspection records that should have been preserved. Therefore, you may, but are not required, to infer that the contents of the voice tapes and track inspection records would have been unfavorable to the defendant." In Arkansas, spoliation is defined as "the intentional destruction of evidence and when it is established, [the] fact finder may draw [an] inference that [the] evidence destroyed was unfavorable to [the] party responsible for its action." *Goff v. Harold Ives Trucking Co., Inc.*, 342 Ark. 143, 146, 27 S.W.3d 387, 388 (2000) (citing *Black's Law Dictionary* 1401 (6th ed.1990)).

 Alan J. Blackwell, a railway consultant, testified in the Barbers' case-in-chief. Prior to becoming a consultant, Mr. Blackwell worked for Union Pacific in many different roles, including track inspector, track supervisor, road master,[7] and assistant road master. After being hired by the Barbers's counsel in this case, Mr. Blackwell asked counsel to get the Union Pacific Inspector's records and the Federal Railroad Track Inspector's records. Counsel, however, was unable to get those documents from Union Pacific. He was also unable to review Union Pacific's dispatch tapes of communications between the dispatcher, the train crew, and the maintenance people. Union Pacific's director of dispatching practices and quality assurance, John Reininger, testified as to the use of the dispatch voice tape. The voice tapes record conversations between a dispatcher and field employee. Mr. Reininger testified that Union Pacific retained the voice tapes for about ninety days, but that a claims representative could make a request to preserve the tape longer. According to Mr. Reininger, the tapes

---

[7] The road master is also called the manager of track maintenance.

were recycled within ninety days even when people die. He also testified that the tapes would reflect reports from engineers of any dangerous condition experienced.

The discovery process in this case was the subject of testimony given by Patricia Long, a senior claims representative for Union Pacific. Ms. Long testified that she was involved as the claims representative and that she received the request for track records in October 1998 for the accident that occurred at Crossing 123 in January of that same year. She testified that the documents were retained for at least one year. Yet, according to Ms. Long, the track records in this case were no longer available when the request was made for them in October. She explained that her request for the track records was forwarded to Union Pacific's Manager of Track Maintenance in December, but no response was forthcoming. When Ms. Long followed up on the earlier request, she was advised that the track inspection records were unavailable.

Mr. Blackwell eventually made a trip to Union Pacific's headquarters in Omaha, Nebraska, and found a stack of "slow orders" concerning a different set of tracks in Louisiana that was subject to arbitration between Union Pacific and Burlington Northern Railroad. Mr. Blackwell discovered that "slow orders" for the 123 Crossing area were listed at the tail end of some of the Louisiana "slow orders." Blackwell explained that in 1996, before Union Pacific owned the tracks, various "slow orders" had been issued for the track covering the 123 Crossing. Those "slow orders" reduced the train's maximum speed from sixty miles per hour to forty miles per hour. As noted earlier, Union Pacific merged with Southern Pacific on September 11, 1996. Although Mr. Blackwell had experience at Union Pacific maintaining computerized records of "slow orders," when he tried to find "slow orders" covering the 123 Crossing, Union Pacific told him the records did not exist. He was also unable to get Union Pacific's track inspection records. Finally, Mr. Blackwell discovered that Union Pacific had entered into a contract to have the overgrown vegetation at Crossing 123 cut back in August 1997, but it did not allot money for the contract.

Union Pacific cites this court to *Missouri Pacific Railroad v. Mackey*, 297 Ark. 137, 760 S.W.2d 59 (1988), as authority for its assertion that there is insufficient evidence to support an award of punitive damages. In *Mackey*, we held that while there was no question of the railroad's negligence in maintaining its right-of-way, the evidence did not support an award of punitive damages.

The *Mackey* court pointed out that there was no evidence that the crossing was hazardous or that the dangers had been presented to the railroad.

Based on the evidence detailed above, we conclude that there was ample evidence that Crossing 123 was hazardous and that Union Pacific was on notice of its condition. Here, direct evidence reflects that Union Pacific was notified of an imminent danger at Crossing 123. In addition, through the spoliation instruction, the jury was at liberty to infer that the destroyed voice tapes and track records contained remarks about the near misses testified to at trial and the dangerous condition presented by the overgrown vegetation. We conclude that the evidence in this case was sufficient to allow the jury to conclude that Union Pacific likely knew or ought to have known, in light of the surrounding circumstances, that allowing the vegetation to remain overgrown and allowing trains to pass through Crossing 123 at close to sixty miles per hour would naturally or probably result in injury, and that Union Pacific continued such conduct in reckless disregard of the consequences from which malice could be inferred.

### B. Excessive Punitive Damages Award

In addition to arguing that there was insufficient evidence to support an award of punitive damages, Union Pacific argues the award given by the jury is excessive under either state or federal standards. We have recently explained the standard for reviewing a claim of excessive punitive damages:

> We consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. Punitive damages are a penalty for conduct that is malicious or perpetrated with the deliberate intent to injure another. When punitive damages are alleged to be excessive, we review the proof and all reasonable inferences in the light most favorable to the appellees, and we determine whether the verdict is so great as to shock the conscience of this court or to demonstrate passion or prejudice on the part of the trier of fact. It is important that the punitive damages be sufficient to deter others from comparable conduct in the future. The conscious indifference of the alleged wrongdoer to the wrong committed is a pertinent factor in assessing punitive damages.

*Advocat Inc. v. Sauer*, 353 Ark. 29, 50-51, 111 S.W.3d 346, 358 (2003) (citations omitted).

█ We start by examining the enormity of the wrong in this case. There is evidence that Union Pacific was on notice of the dangerous and life threatening nature of this crossing through the complaints of its own personnel and the complaints of the public. There is also evidence that several near-misses occurred at this crossing. Furthermore, the record reflects that Union Pacific destroyed important evidence directly related to this accident, including voice tapes and track inspection records. Viewing the proof and all the evidence in the light most favorable to the Barbers, we conclude that Union Pacific knew, or should have known of the extreme danger presented to the public at Crossing 123. In recognizing that danger, Union Pacific still consciously refused to remedy the situation. As such, Union Pacific's conduct reflects that it intentionally put the traveling public in harm's way. Under these circumstances, the enormity of the wrong is substantial.

█ There was also evidence to indicate a malicious intent perpetuated by Union Pacific. As noted by the Barbers in their brief, the record in this case reflects the development of a corporate policy at Union Pacific that put company profits before public safety. In addition to evincing that corporate policy through the handbooks given to claims representatives, the Barbers presented expert testimony from Dr. Harvey Levine who performed an economic study and opined that Union Pacific's practices reflected that policy.

█ Lastly, we consider the financial and social condition and standing of Union Pacific. During the second phase of the bifurcated trial where the jury was called upon to determine the amount of punitive damages, Union Pacific stipulated that its net worth was $9.6 billion. Thus, there is no doubt that Union Pacific is in a strong financial and social condition. We note that the punitive damages award of $25 million amounts to 0.260% of Union Pacific's net worth.

██ Taken together under all the circumstances, including the evidence that Union Pacific intentionally destroyed unfavorable evidence, we conclude that an award of punitive damages was appropriate in this case. Thus, we turn next to determine whether the amount of punitive damages shocks the

conscience of the court. The United States Supreme Court has enunciated a three-factor test to determine whether an award of punitive damages is excessive. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). A *Gore* analysis is to be undertaken by the appellate court *de novo. Advocat v. Sauer, supra.*

■ Under *Gore*, to determine whether Union Pacific received adequate notice of both the conduct that would subject it to punishment and the magnitude of the sanction, we consider the following three factors:

(1) the degree of reprehensibility of the defendant's conduct;

(2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and

(3) the difference between this remedy and the civil penalties authorized by statute or imposed in comparable cases.

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). The three *Gore* criteria are to be given equal weight. *Advocat v. Sauer, supra.* We have employed the *Gore* test in three cases. *See Advocat Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003); *Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998); *Routh Wrecker Service v. Washington*, 335 Ark. 232, 980 S.W.2d 240 (1998).

### (i) Degree of Reprehensibility

■ Between *Gore* and its latest decision in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), the United States Supreme Court has enunciated several factors to consider in examining the reprehensibility of the tortfeasor. The Court held in *Gore* that (1) where the harm inflicted by the tortfeasor was "purely economic in nature[,]" (2) there was no evidence that the tortfeasor had acted in bad faith, (3) there was no evidence that the tortfeasor had "persisted in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeated occasions[,]" and (4) the record failed to disclose any "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive," the tortfeasor's conduct was not sufficiently reprehensible to warrant the imposition of a $2 million award. In *State Farm Mut. Ins. Co. v. Campbell, supra*, the Court elaborated on factors for consideration when assessing reprehensi-

bility: "whether the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

In the case at bar, the injury inflicted by Union Pacific was physical and not merely economic. Mr. Barber, as the passenger in the garbage truck, was severely injured while the driver, Mr. Rolfe, was killed. As already explained, there was evidence that Union Pacific prioritized monetary gain over the personal safety of those crossing its train tracks. In addition, the record reflects that Union Pacific engaged in acts of affirmative misconduct after being notified of the accident and the lawsuit against it. The evidence shows that Union Pacific intentionally destroyed track records and voice tapes. Furthermore, there is evidence from which a jury would reasonably conclude that Union Pacific attempted to conceal "slow orders" issued for this portion of track. The record also supports a finding that Union Pacific manifested a reckless disregard for the health and safety of others. Specifically, Union Pacific ignored the dangerous condition of a crossing in the face of constant complaints and near misses. While this was the first time that an accident had occurred at this crossing, there was evidence of several prior near-misses. Under these circumstances, we conclude that Union Pacific's conduct was indicative of a high degree of reprehensibility.

### (ii) Ratio

The *Gore* analysis also requires the court to consider the ratio of compensatory damages to punitive damages. Here, the compensatory damages were set by the jury at $5,100,000 and the punitive damages were set at $25,000,000. The multiplier in this case is roughly 5. Most recently, the Supreme Court has held that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1, ... or, ... of 145 to 1." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. at 425. The standard to be employed is whether the ratio is "breathtaking." *See Advocat, supra.* Under the circumstances of this case, a multiplier of 5 is justified.

### (iii) Civil Sanctions

The final factor adopted by the United States Supreme Court in *Gore* for adequate notice is that of comparing the punitive damages award to the civil or criminal penalties that could be imposed for similar misconduct. *See Advocat v. Sauer, supra.* The Barbers point this court to 49 C.F.R § 213.5 (2003) and states that Union Pacific could have been fined up to $22,000 per day for each day of noncompliance. Union Pacific, on the other hand, directs this court to *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001), for the proposition that a fine cannot be multiplied on the theory that each day was a separate violation because the accident only happened once. Although the Supreme Court indicated in *Cooper v. Leatherman* that it would view passing out promotional material as a single incident under the Oregon Unlawful Trade Practices Act, it made no ruling on the issue because the lower court did not apply the proper standard of review. *Id.*

A specific federal regulation governs vegetation on railroad property. 49 C.F.R. § 213.37 (2003) provides:

> Vegetation on railroad property which is on or immediately adjacent to roadbed shall be controlled so that it does not —
>
> (a) Become a fire hazard to track-carrying structures;
>
> (b) Obstruct visibility of railroad signs and signs and signals:
>
> (1) Along the right-of-way, and
>
> (2) At highway-rail crossings; (This paragraph (b)(2) is applicable September 21, 1999.)
>
> (c) Interfere with railroad employees performing normal trackside duties;
>
> (d) Prevent proper functioning of signal and communication lines; or
>
> (e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

As noted earlier, Willie Savage testified that the vegetation at Crossing 123 caused his crew problems while they performed a cluster-buster

repair on the railroad ties. Thus, there is evidence that the vegetation at Crossing 123 interfered with railroad employees performing normal trackside duties. The penalty provision of the federal code at issue states in pertinent part:

> a) Any person who violates any requirement of this part or causes the violation of any such requirement is subject to a civil penalty of at least $500 and not more than $11,000 per violation, except that: Penalties may be assessed against individuals only for willful violations, and, where a grossly negligent violation or a pattern of repeated violations has created an imminent hazard of death or injury to persons, or has caused death or injury, a penalty not to exceed $22,000 per violation may be assessed.

49 CFR § 213.15 (2003). The regulatory provision at issue specifically contemplates recurring violations and increases the maximum penalty in those situations where a violation persists. In fact, the penalties provision of the code specifically states, "[e]ach day a violation continues shall constitute a separate offense." 49 C.F.R. § 213.15(a). Here, the evidence clearly reflects that the vegetation at Crossing 123 was potentially out of compliance from the time Union Pacific took over the tracks in September 11, 1996. Under the federal code, Union Pacific could be fined for each day of non-compliance after September 11, 1996. As such, the maximum civil penalty in this case may be calcualted by multiplying $22,000 by each day of noncompliance. There were over 450 days between September 11, 1996, and the date of the accident at Crossing 123 on January 19, 1998. Accordingly, Union Pacific's noncompliance made them potentially liable for about $9.9 million.

 In addition, Union Pacific could have been potentially liable under Arkansas law. The pertinent statutory provision provides:

> (a)(1) All railroad corporations operating in this state shall maintain their right-of-way at or around any railroad crossing of a public road or highway free from grass, trees, bushes, shrubs, or other growing vegetation which may obstruct the view of pedestrians and vehicle operators using the public highways.

> \* \* \* \*

> (b) Any railroad corporation failing or refusing to comply with the provisions of this section shall be subject to a fine of not less than one

hundred dollars ($100) nor more than five hundred dollars ($500) for each violation.

Ark Code Ann. § 23-12-201(a)(1), (b) (Repl. 2002). The plain language of the statute contemplates that a railroad will continue in noncompliance and will be assessed proportionally to the amount of time it fails or refuses to comply. At $500 per day, the railroad's liability could approach up to $182,500 per year. We conclude that the total civil penalties authorized by law are comparable to the punitive damages award set by the jury in this case.

█ █ In *Advocat v. Sauer, supra*, we enforced a $21 million punitive damages award, based upon a wrongful-death claim stemming from the neglect of a nursing and rehabilitation center's neglect of an elderly patient. Here, the punitive damages award of $25 million stems from a negligence action that resulted in one person's death and caused severe and permanent injuries to another person. We will not substitute our judgment for that of the jury when there is basis in the evidence for the punitive award. *Harold McLaughlin Reliable Truck Brokers, Inc. v. Cox*, 324 Ark. 361, 922 S.W.2d 327 (1996). In addition, the penalty needs to be sufficient to deter others of such conduct. *Id*. We have also recognized that punitive damages may validly amount to a windfall for the plaintiff. *Missouri Pacific R.R. Co., v. Arkansas Sheriff's Boys' Ranch*, 280 Ark. 53, 655 S.W.2d 389 (1983). Under these circumstances, where the award of punitive damages is appropriate and the net worth of the company is $9.6 billion, we cannot say that a $25 million punishment shocks the conscience.

### V. The Settlement

In its last point on appeal, Union Pacific contends that the circuit court erred in refusing to approve and enforce the settlement agreement around the workers' compensation lien of Allied Waste. This point is without merit.

After going through mediation, Union Pacific and the Barbers entered into a settlement agreement. The settlement specifically stated that it was contingent upon approval and payment by February 18, 2000. A hearing by telephone conference on the settlement was set for February 28, 2000, and the Barbers sent a proposed order by facsimile to Union Pacific with a notation that counsel intended to submit the proposed order to the court after the telephone hearing. The record does not reflect whether the

proposed order was ever submitted to the court. It is clear, however, that the court did not sign the proposed order. Instead, the court filed a letter order on March 3, 2000, which stated as follows:

> The court having considered Allied Waste Industries, Inc.'s objection to petition to approve settlement around workers' compensation carrier and all matters finds:

> That in accordance with Ark. Code Ann. § 11-9-410 and Arkansas case law that the Plaintiffs can settle around the W.C.C. carrier if the settlement is approved by the court. However, the W.C.C. carrier will have a lien on the proceeds of the settlement.

In response to that letter order, the Barbers notified Union Pacific via facsimile letter of their intent to appeal the court's order. In fact, neither party appealed the order, or attempted to have the court reconsider its ruling. On March 27, 2001, or more than one year after the expiration of the settlement offer, Union Pacific sought to enforce the agreement against the Barbers.

The only substantive case that Union Pacific cites for the notion that the contract was enforceable one year after the stated expiration is *Helms v. Helms*, 317 Ark. 143, 875 S.W.2d 849 (1994). Union Pacific cites *Helms* for the proposition that the fact a party enters into a settlement that later appears to be improvident is no ground for relief. In that case, a spouse attempted to set aside a divorce settlement after admitting he consulted an attorney and nobody pressured him to sign the agreement. *Id. Helms* is inapposite.

██ ██ Union Pacific sought to have the terms of the settlement agreement enforced. Specific performance is an equitable remedy which compels the performance of an agreement or contract on the precise terms agreed upon. *City of Crossett v. Pacific Bldgs., Inc.*, 298 Ark. 520, 769 S.W.2d 730 (1989). The precise terms of the settlement agreement called for court approval prior to February 18, 2000. The circuit court ruled that the failure of the court to approve the settlement discharged the parties from their obligation to perform under the contract. The trial court's ruling was correct.

### VI. Motion To Strike

After the Barbers filed their brief on appeal, Union Pacific filed a motion to strike portions of the Barbers' brief. That motion

is still outstanding as we initially passed on it until the submission of the case. In their motion, Union Pacific requests that we strike three specific portions of the Barbers' brief on appeal.

■ First, Union Pacific requests that we strike a "Table of Jurisdictions" included in the supplemental addendum to the Barbers' brief on appeal. The "Table of Jurisdictions" is a list of cases from across the country that hold evidence of near-misses is admissible in railroad accident cases at the court's discretion. Union Pacific contends that the list of cases should be stricken from the brief pursuant to Rule 11 of the Arkansas Rules of Appellate Procedure and Rule 4-2 of the Supreme Court Rules. In response, the Barbers explain that while the table was only provided as a research aid to the court, it may be disregarded. Accordingly, as there is no dispute on the issue, we grant Union Pacific's request that we strike the "Table of Jurisdictions."

■ Second, Union Pacific contends that we should strike a page in the Barbers' supplemental addendum described as Plaintiff's Exhibt 63-A because it is not part of the record. We note that while it appears Plaintiff's Exhibit 63-A may have been used at trial, it was never received into evidence and is not part of the record on appeal. This court will not consider a document which is included in the addendum and not in the record. *Barnett v. Monumental General Insurance Co.*, 354 Ark. 692, 128 S.W.3d 803 (2003). Accordingly, we strike Plaintiff's Exhibit 63-A from the Barbers' supplemental addendum.

Lastly, Union Pacific urges this court to strike a portion of the Barbers' brief that purportedly accuses counsel for Union Pacific of suborning perjury. The pertinent section of the brief states:

> Furthermore, while in Gore, at 579, the Court noted that the record failed to disclose any deliberate false statements, acts of affirmative misconduct, or concealment of evidence or improper motive, the record in this case reveals deliberate destruction of voice tapes, track inspection records, UP efforts to conceal evidence, and suborning perjury.

(Emphasis added.) At trial, the Barbers alleged that Union Pacific engaged in suborning perjury of key defense witnesses both before and during trial. The Barbers now assert that the statement in their brief on appeal was not an allegation of suborning perjury; rather, it

was a statement of the issue before the court in upholding a punitive damages award. The Barbers then make allegations of fact which they contend support a good faith basis for the allegation. Specifically, the Barbers explain that certain crewmen recounted the accident in crew interview briefs, and then, after meeting with counsel for Union Pacific, changed their statements. The trial court was presented with the issue in the Barbers' Response to Union Pacific's posttrial motion for judgment notwithstanding the verdict. That argument was not pursued in the hearing on the motion and the circuit court never made a ruling on it.

 *Gibson v. Boling*, 274 Ark. 53, 622 S.W.2d 180 (1981) is instructive on the issue. In that case, we granted an appellant's request to strike a portion of the appellee's brief which implied that the former solicitors for the appellants were dishonest and committed what amounted to subornation of perjury. *Id.* While we recognize that this case has been heated from start to finish, we think that the Barbers have gone too far in their brief on appeal by suggesting that Union Pacific and its counsel suborned perjury. Indeed, the Barbers concede that they are not asking this court to determine whether suborning perjury occurred. The claim of suborning perjury is tantamount to a claim that Union Pacific acted criminally. *See* Ark. Code Ann. § 5-53-110 (Repl. 1997). We grant Union Pacific's request to strike that portion of the Barbers' brief.

Affirmed.

DICKEY, C.J., and THORNTON, J., dissent.

RAY THORNTON, Justice, dissenting. I dissent on the basis that a $25 million punitive-damage award is excessive. I would hold that the trial court erred in denying Union Pacific's motion for remittitur of punitive damages.

A remittitur is within the inherent power of the court if an award is grossly excessive or appears to be a result of passion or prejudice. *McNair v. McNair*, 316 Ark. 299, 870 S.W.2d 756 (1994). The reviewing court will reverse a remittitur if the punitive-damages award is supported by evidence and does not shock the conscience of the court. *Id.*

To determine whether the award is excessive under state law, we must analyze whether the jury's verdict is so great as to shock the conscience of the court. *Advocat, Inc. v. Sauer*, 353 Ark.

29, 111 S.W.3d 346 (2003). In applying the test for excessiveness, we make a case-by-case determination, and the award of punitive damages may be reduced if the verdict shocks the conscience of the court or demonstrates that the jurors were motivated by passion or prejudice. *Harold McLaughlin Reliable Truck Brokers, Inc. v. Cox,* 324 Ark. 361, 922 S.W.2d 327 (1996).

I view the $25 million punitive-damage award as excessive. The facts in this case reflect a non-fatal injury to appellant, as contrasted with the facts in *Advocat, supra,* where the death of a nursing-home patient followed an extended period of neglect. In *Advocat,* we held that a punitive damage award of $63 million shocked the court's conscience, and we reduced the award to $21 million. *Id.* Before *Advocat,* the highest punitive-damages award that was affirmed by this court was $3 million. *See Airco, Inc. v. Simmons First Nat. Bank,* 276 Ark. 486, 638 S.W.2d 660 (1982).

Here, the evidence does not support a $25 million award in punitive damages. First, I cannot find where the Arkansas Highway Department required or suggested additional safety devices at Crossing 123. Second, Patricia Long, a senior claims representative for Union Pacific, testified that in her inspection of Union Pacific track records, she found no evidence that there had been any traffic accidents at Crossing 123. Third, Union Pacific entered into a contract with Tweedy Contractors to clear the vegetation four months prior to the accident, specifically taking affirmative steps to remedy any vegetation problem at Crossing 123, thereby demonstrating a lack of malice. For these reasons, I do not find sufficient evidence to support such an excessive award of punitive damages, and I respectfully dissent.

Because I would remit the excessive punitive damages on the basis of prior Arkansas law, it is unnecessary to delve into an analysis under *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996).

I am authorized to state that Chief Justice DICKEY joins in this dissent.